The STATE of Ohio, Appellee,

v.

VITALE, Appellant.*

[Cite as *State v. Vitale* (1994), 96 Ohio App.3d 695.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 64573.

Decided Aug. 8, 1994.

---

* Reporter's Note: A discretionary appeal to the Supreme Court of Ohio was not allowed in (1995), 71 Ohio St.3d 1443, 644 N.E.2d 406.

*Stephanie Tubbs–Jones,* Cuyahoga County Prosecuting Attorney, and *William Telzrow,* Assistant Prosecuting Attorney, for appellee.

*Charles Van Ness,* for appellant.

JAMES M. PORTER, Judge.

Defendant-appellant Steven Vitale appeals from his conviction for theft (R.C. 2913.02) following a bench trial. This case arose out of a dispute over defendant's failure to pay for car repairs which he claimed were not properly performed. Defendant argues that he was convicted on evidence that was not presented to the grand jury; that the state's evidence was insufficient to prove the elements of theft; that his conviction was against the manifest weight of the evidence; and that the judgment of the trial court cannot stand because it is duplicitous, inconsistent and repugnant. For the reasons hereinafter stated, we find that defendant's appeal has merit and reverse.

The defendant was indicted for theft alleged to have occurred on June 14, 1991. The indictment recited that on or about that date defendant:

"Unlawfully and knowingly did obtain or exert control over car repairs with the purpose to deprive the owner, National Auto Body, of said property or service, without the consent of the owner or person authorized to give consent and/or knowingly and by deception obtained or exerted control over car repairs with the purpose to deprive the owner, National Auto Body, of said property or services.

"The value of said property or services being $5,000.00 or more."

The state's bill of particulars confirmed that the offense occurred "on or about June 14, 1991, at approximately 12:00 p.m., at the location of 1869 East 79th Street in the City of Cleveland."

The evidence at trial disclosed that in February 1991, defendant purchased a 1990 Grand Prix "pace car" with turbo power for $27,500. The car was involved in an accident on April 25, 1991, and defendant took it to National Auto Body

("National") for repairs on May 1, 1991. National was owned an operated by James Amos.

Amos testified that defendant told him that, in order to get the repair job, National would have to save defendant the $1,000 deductible on his car insurance policy.

Shortly thereafter, an appraiser for defendant's insurer inspected the damaged car at National and estimated the repair cost at $6,049.27. Amos contacted defendant and said he would repair the car for the estimate. Defendant again expressed concern about the deductible. Amos said the only way he could lessen the cost was "to rob Peter to pay Paul," but finally agreed to the repairs for $5,049.27. Defendant was insistent that the most important thing was that the repairs were properly made with original factory parts because of the unique value of the car.

National went ahead and repaired the car using a standard factory hood rather than an original equipment turbo hood. Amos testified he saved defendant $700 by converting the standard hood rather than paying for the more expensive turbo hood.

On June 14, 1991, defendant came to National to pick up the car. Defendant had not yet received the repair check from the carrier. Amos called defendant's insurer who confirmed it had not yet sent out the repair check and was told that it would go out the following week. Amos gave defendant a bill for $6,042.27 and defendant took the car home.

When Amos didn't receive the check, he called the insurer who told him the check had been sent to defendant. On June 21, 1991 defendant went to Amos' house and complained that the repairs were not done properly, i.e., front bumper alignment, the side molding and slight chips in the roof paint. Defendant testified he also complained to Amos about not installing an original turbo hood, but Amos denied that, saying that defendant said nothing about the hood. In any event, defendant left his car with Amos and drove off in Amos' mother-in-law's car as a loaner. However, after a few minutes, he returned and reclaimed his car which he needed to go out of town to a reunion. Defendant testified that he did need his car to go to a reunion, but he also decided he couldn't trust Amos to do the repairs because he had lied to him about the hood. The trial court specifically found that Amos had lied about the hood both to defendant and in court. Defendant never took the car back to Amos but later obtained estimates from three other body shops to fix the car. All three submitted estimates of approximately $3,000.

In July 1991, Amos contacted a Cleveland police detective to see what he could do about collecting the repair bill. The detective, an admitted personal friend

and partner of Amos, testified to putting pressure on defendant, *i.e.*, if he didn't pay up he would face criminal charges. The detective testified that he declined to listen to defendant's complaints about the repair work.

Defendant eventually offered to pay $2,500 to $3,000 to National, but Amos insisted on "not a penny less" than $6,047.27 and the matter lingered on until criminal action was commenced.

At the conclusion of the state's case, the state moved to amend the indictment to show the theft offense was committed from "June 14, 1991 through June 21, 1991 inclusive." Over objection, at the conclusion of all the evidence, the court allowed the amendment, overruled defendant's Crim.R. 29(A) motion for acquittal and found defendant guilty of felony theft between $300 and $5,000.

This timely appeal followed.

"I. The trial court erred in permitting the state to amend the indictment under Criminal Rule 7(D) to reflect essential facts not in the indictment presented to the grand jury, over the objection of appellant."

We find that the trial court erred in allowing the state to amend the indictment pursuant to Crim.R. 7(D) to change the date of the offense from June 14, 1991 to "June 14, 1991 through June 21, 1991 inclusive." The court stated that the defendant "wouldn't be misled or prejudiced by at least correcting that defect in that limited fashion." Despite the court's assurances, there is a grave risk in this case that defendant was convicted by the trial court of a felony on evidence that was not presented to the grand jury. "[N]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a grand jury * * *." Section 10, Article I, Ohio Constitution. This provides an inalienable protection to the defendant that he will be tried on the same essential facts on which the grand jury found probable cause. As stated in *State v. Headley* (1983), 6 Ohio St.3d 475, 478–479, 6 OBR 526, 529, 453 N.E.2d 716, 720:

"This provision guarantees the accused that the essential facts constituting the offense for which he is tried will be found in the indictment of the grand jury. *Harris v. State* (1932), 125 Ohio St. 257, 264 [181 N.E. 104, 106]. Where one of the vital elements identifying the crime is omitted from the indictment, it is defective and cannot be cured by the court as such a procedure would permit the court to convict the accused on a charge essentially different from that found by the grand jury. *Id.; State v. Wozniak* (1961), 172 Ohio St. 517, 520, [18 O.O.3d 58, 59], 178 N.E.2d 800, 802."

The indictment herein only specified the date of the offense as on or about June 14, 1991. The defense sought a bill of particulars. "[T]he state must, in

response to a request for a bill of particulars * * * supply specific dates and times with regard to an alleged offense where it possesses such information * * *." *State v. Sellards* (1985), 17 Ohio St.3d 169, 17 OBR 410, 478 N.E.2d 781, syllabus. In response, the state's bill of particulars further specified that the offense occurred "on or about June 14, 1991 at approximately 12:00 p.m., at the location of 1869 East 79th Street, in the City of Cleveland, Ohio." If the state had knowledge that the offense charged could also have occurred on June 21 at Amos' home, then it was obliged to so state. Since it didn't, it must be presumed that the evidence presented to the grand jury was limited to the June 14 episode identified in the state's bill of particulars and not some other date, time or place to which no reference is made. As this court stated in *State v. Bernstein* (1937), 25 Ohio Law Abs. 291, 303:

"In considering the questions raised by the first assignment of error, it is well to keep in mind that when the prosecuting attorney files a bill of particulars, the state is confined to the items therein set down. 14 R.C.L. 191. This rule applies to each count of the indictment."

Thus, the defendant herein was entitled to a bill of particulars that presented the ultimate facts upon which the state relied to establish its case, and the state "should be restricted in its proof to the indictment and the particulars as set forth in the bill." *State v. Miller* (1989), 63 Ohio App.3d 479, 485–486, 579 N.E.2d 276, 281; *State v. Collett* (App.1944), 44 Ohio Law Abs. 225, 233, 58 N.E.2d 417, 419. But, the trial court herein acquitted the defendant of any offense occurring on or about the June 14th date: ("But I find there was no theft on that day * * * "). Instead, the trial court convicted the defendant of theft which it found occurred on June 21, 1991 at the alleged victim's house, not his place of business. The risk then is squarely presented that defendant was convicted of an offense on evidence that was never presented to the grand jury. In applying the similar protection of the Fifth Amendment, this potential must be considered critical, as in *United States v. Ford* (C.A.6, 1989), 872 F.2d 1231, 1236:

"Absent language indicating the grand jury's intent to permit a conviction based on more than one incident of criminal conduct, a court cannot assume that a grand jury would have included in its indictment an additional incident of criminal conduct. *See* [*Ex parte* ] *Bain*, [ (1887) ], 121 U.S. [1] at 10, 7 S.Ct. [781] at 786 [30 L.Ed. 849 at 852]. It is therefore possible that the jury convicted Ford based on an incident of possession not intended by the grand jury to be part of the charge. This frustrates the fifth amendment grand jury indictment guarantee."

Under such circumstances, we find the conviction cannot stand and must be reversed. Under Crim.R. 7(D), the trial court had discretion to amend the indictment "provided no change is made in the name or identity of the crime charged." Obviously, if the identity of the crime moves from events on June 14

to different events on June 21, at a different time and place, the identity of the crime has been improperly changed. Where the amendment to an indictment requires proof of an essential factual element which the original indictment did not, "the amendment of the indictment changed the identity of the crime charged in contravention of Crim.R. 7(D)." *State v. Woody* (1986), 29 Ohio App.3d 364, 365, 29 OBR 493, 494, 505 N.E.2d 646, 647; *United States v. Ford, supra.*

The issue is not, as the state argues, and the trial court found, that defendant was not surprised or prejudiced by the belated amendment—the issue is whether he was convicted on the same evidence on which he was indicted. See *State v. Barnecut* (1988), 44 Ohio App.3d 149, 542 N.E.2d 353. In that case, the court stated:

"Appellant's due process rights to a fair trial were violated when the trial court allowed the indictment to be amended with regard to the first two counts after the state's case-in-chief was completed. If no evidence is presented that the alleged offenses occurred within the bracketed time frames specified in the indictment, the counts in the indictment relating to those offenses should be dismissed. Any variance of proof outside the parameters of time established by the indictment may constitute a separate offense. This analysis suggests a bright-line test, *i.e.,* that an accused be tried for the crimes alleged in the indictment, and that any evidence outside the time period established in the indictment may constitute a separate offense requiring separate process * * *. Final judgment, per App.R. 12(B) is entered dismissing those two counts." *Id.* at 153, 542 N.E.2d at 356–357.

Finally, the Supreme Court made clear in *State v. Dilley* (1989), 47 Ohio St.3d 20, 546 N.E.2d 937, that when the identity of the crime is changed, it does not matter whether the defendant can show prejudice. The purpose of the rule is to avoid the potential of prosecutorial abuse. The court held:

"In general terms, whether Dilley suffered prejudice because of the amendment to the indictment has no bearing on the resolution of this case. R.C. 2941.143 is mandatory and cannot be circumvented in this manner. While the record of this case does not blatantly suggest prosecutorial abuse, to permit such amendments could possibly lead to such abuse, and intervention by the grand jury process is thus necessary.

"We therefore hold that the state may not amend an indictment so as to include a specification contained in R.C. 2941.143 without first presenting the specification to the grand jury or following the other alternatives contained therein. The state may not avoid the clear mandates of R.C. 2941.143 and circumvent the grand jury process, as was done in this case." *Id.* at 22–23, 546 N.E.2d at 939.

Since the state, by amendment to the indictment herein, changed the identity of the crime, the trial court erred in permitting the amendment. We cannot allow a procedure which would "permit the court to convict the accused on a charge essentially different than that found by the grand jury." *State v. Headley, supra.* See, also, *Russell v. United States* (1962), 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240, 254–255, which summarizes the point as follows:

"To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him."

This assignment of error is sustained.

"II. The verdict of the trial court is against the manifest weight and sufficiency of the evidence and must be reversed."

We also find from the evidence presented that the state failed to prove several essential elements of the crime of theft beyond a reasonable doubt under R.C. 2913.02(A)(1) and (A)(3). The trial court should have granted defendant's Crim.R. 29(A) motion to acquit at the conclusion of all the evidence.

A charge of theft under R.C. 2913.02 required the state to prove, beyond a reasonable doubt, that defendant, with purpose to deprive National Auto of property or services, knowingly obtained or exerted control over either the property or services without the consent of National Auto or its authorized agent or by deception.

We find the evidence was insufficient, as a matter of law, to establish that: (1) the alleged victim was the owner or had property or services subject to theft by defendant; (2) defendant possessed the purpose to deprive the alleged victim of his property without reasonable justification; (3) defendant knowingly obtained or exerted control over the property without the owner's consent; and (4) defendant obtained the property by deception.

A garageman's right to retain possession of a repaired car pending payment depends on his common law lien. *Commonwealth Loan Co. v. Berry* (1965), 2 Ohio St.2d 169, 170, 31 O.O.2d 321, 321, 207 N.E.2d 545, 546. Therefore, the state was obliged to prove that the garageman had a superior possessory right to the vehicle over the registered owner in order for the repairs to be subject to theft. It is elementary that an artisan must retain possession of the property in order to assert a possessory interest or lien thereon. If he voluntarily surrenders the improved chattel, his possessory lien is lost. See *Baum v. Handy* (1889), 46 Ohio St. 560, 22 N.E. 869; *Cleveland Auto Top & Trimming*

*Co. v. Am. Finance Co.* (1931), 124 Ohio St. 169, 172, 177 N.E. 217, 218. By relinquishing possession, the lien and his possessory interest is lost and he becomes a general creditor. Repossession cannot reestablish the lien. *Am. Sec. Corp. v. Martin* (1948), 83 Ohio App. 477, 38 O.O. 497, 84 N.E.2d 306. In *Church of Bible Understanding v. Bill Swad Leasing Co.* (1981), 2 Ohio App.3d 382, 2 OBR 455, 442 N.E.2d 78, paragraph one of the syllabus states:

"The voluntary surrender of possession of a chattel, by one attempting to assert an artisan's lien thereon, results in the loss of said lien forever. If the lien claimant is improperly deprived of his possession, however, as for instance by fraud, the lien is not lost."

In the instant case, the trial court specifically found that the garageman, James Amos, voluntarily returned possession of the car on the date of first delivery, June 14, 1991 without any deceptive inducement by defendant. The trial court stated: "I find there was no theft that day because the check clearly had not been issued to the defendant." Thus, on June 14, 1991, defendant legally reclaimed full possession of his own car free of the lien, and Amos correspondingly relinquished any interest in said car which could be the subject of theft.

His momentary repossession of June 21, 1991, by defendant's leave, did not operate to reestablish a lien once extinguished because he made no further repairs to the vehicle at that time. The defendant was within his rights to change his mind about letting National cure the repairs and retaking possession of his car. Since National had no possessory right to the vehicle on June 21, there was nothing for defendant to steal.

The state also failed to show beyond a reasonable doubt that defendant had the requisite criminal purpose to deprive National of any property. Defendant was the owner of a rare "pace car" worth $27,500. National had returned it to him and presented a repair bill for over $6,000. Defendant was dissatisfied with the repairs and felt National had cheated and lied to him by installing a standard hood rather than a "turbo" hood necessary to preserve the value of the car. The trial court agreed that Amos was lying about the hood and that, in fact, defendant's suspicions were justified. There was no evidence that defendant had the "purpose to deprive" required by the statute. R.C. 2913.01(C)(3) defines "deprive" as: "accept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return therefor, [for the money, property or services,] and without reasonable justification or excuse for not giving proper consideration."

Defendant offered to pay Amos $2,500 to $3,000 for the repairs that had been properly made which clearly evidenced his offer of "proper consideration." He had "reasonable justification or excuse" for not giving more; *i.e.,* Amos was lying

about the hood and defendant would have to expend at least $3,000 to put the right hood on the car and fix the other repairs. Even if defendant was mistaken in his belief, there was no evidence that he had a criminal intent to cheat Amos out of the cost of legitimate repairs, especially when Amos was insisting on full payment for work, some of which (the false hood) the court found was improperly done.

■ There is also no evidence that defendant knowingly obtained or exerted control over the property without the owner's consent. When defendant picked up the car at National on June 14, National gave up its possessory lien and became a general creditor. The labor and parts constituting the repairs became part of the car which was released with the consent of the owner. Furthermore, the burden was on the state to show that when defendant picked up the car he had no intention of paying for the repairs. There was no such evidence. Compare *State v. Bakies* (1991), 71 Ohio App.3d 810, 814, 595 N.E.2d 449, 452, where this court stated:

"The issue is not, as the state claims, whether appellant deceived the victim by telling her the money would be paid back two to three weeks later; rather, the issue is whether the state showed that, at the time appellant borrowed the money he never intended to pay it back." (Footnote omitted.)

On June 21, when defendant dropped the car off at Amos' house and then took it back, no new right to possession arose because National did not work on it or make any improvement creating a new lien. There again, National consented to the release of the car. It was no fraud for defendant to say he needed the car to go to his reunion when the evidence was undisputed that he went to the reunion. Furthermore, this was not a material deception because defendant had an absolute right to possession of the vehicle at that time. It was his car—he could take it back at any time.

Finally, we note that the criminal process is a blunt instrument to solve civil or commercial disputes. It should only be invoked under extraordinary circumstances, which we do not find here. If every repairman or vendor can hold the threat of criminal prosecution over the heads of his dissatisfied customers, the overburdened criminal justice system will have to be greatly expanded to assist in collection efforts. See, also, *State v. Fyffe* (1990), 67 Ohio App.3d 608, 588 N.E.2d 137, where a home repair contractor was indicted for grand theft (R.C. 2913.02[A][3] ) for knowingly obtaining or exerting control over $6,566 by deception by charging a homeowner for repairs which were not done. The court held that the contractor's Crim.R. 29(A) motion for acquittal should have been granted.

"Simply because appellant charged more for his work than someone else might have, and simply because appellant did not complete the work in accordance with Grashel's standards, does not prove that appellant knowingly deprived [the homeowner] of services or her money by deceiving her." *Id.* at 615, 588 N.E.2d at 141–142. By the same token, simply because defendant refused to pay the agreed sum for unsatisfactory repairs does not prove a violation of the offense charged.

"If anything, the evidence at trial presents a typical breach of contract action where the alleged breach constitutes a failure of substantial performance of the contract by appellant." *Id.* at 617, 588 N.E.2d at 142.

In short, we find that the evidence was insufficient to sustain the state's case beyond a reasonable doubt and a judgment of acquittal should have been entered in defendant's favor.

This assignment of error is sustained.

In view of our disposition of the first two assignments of error, it is not necessary to address Assignment of Error III. See App.R. 12(A)(1)(c).

*Judgment reversed*
*and defendant discharged.*

DAVID T. MATIA, P.J., concurs.

NUGENT, J., dissents.

NUGENT, Judge, dissenting.

I respectfully dissent from the majority's decision to reverse appellant's conviction. After a thorough review of the record before this court, I believe the trial court did not err in allowing the state to amend the indictment pursuant to Crim.R. 7(D) to change the date of the offense from June 14, 1991 to June 14 through June 21, 1991, inclusive. I also believe that the state presented evidence which, if believed, could convince the average mind of appellant's guilt beyond a reasonable doubt.

To fully understand my position, it is necessary to revisit the facts of this case.

I

The record reveals that in approximately February 1991, appellant purchased a 1990 Grand Prix pace car with turbo power from its original owner for $27,500. On April 25, 1991, appellant was involved in an automobile accident, during which the car sustained extensive damage. Upon the recommendation of his friend, Paul Formicelli, appellant took the car to National Auto Body ("National") for an

estimate of the cost of repair. National is owned and operated by James Amos, who at the time was Formicelli's future father-in-law.

Amos testified that on May 1, 1991, appellant and Formicelli came to Amos' body shop, located at 1869 East 79th Street in Cleveland, Ohio, for the purpose of obtaining a quote of the cost of repairing appellant's car. According to Amos, appellant was very concerned about his $1,000 insurance deductible and told Amos that in order for National to get the repair job, it would somehow have to save him the cost of the deductible. Amos said he agreed to this term, and they then entered into an oral agreement for National to perform the repairs. Amos did not give appellant a written estimate of the cost of repair at this time.

Shortly thereafter, an appraiser for appellant's insurer, Bankers and Shippers, went to National, inspected the damage to appellant's car, and estimated the total cost of repair to be $6,049.27. Relying on this estimate as a working guideline, Amos contacted appellant and told him he could repair the car for $6049.27. Amos said appellant again expressed concern about his $1,000 deductible. Amos told appellant the only way he knew to lessen the cost of the repair job was to "rob Peter to pay Paul." Amos said that after some further discussions, he agreed to perform the repairs for the amount of the insurance check, *i.e.*, $5,049.27. Amos also said that appellant gave him no instructions on where he was to cut corners in order to save the deductible. Amos claimed he never assured appellant he would perform every item of repair listed in the appraiser's report.

Amos also testified regarding the repairs made to the car. Specifically at issue were the repairs made to the hood of the car. Amos testified that he originally ordered a new factory turbo hood for the car, at a cost of $1,621, but was having trouble getting the hood from the supplier because of back orders at the factory. After waiting several weeks for the turbo hood, Amos said he canceled the order because when the damaged hood was removed, he discovered that it was not a turbo hood but, rather, was a standard factory Grand Prix hood that had been converted into a turbo hood. Based on this discovery, Amos said he replaced the damaged non-turbo hood with a new factory standard hood, which he converted into a turbo hood by cutting two holes in it and inserting vents. By converting the standard Grand Prix hood to a turbo hood, Amos saved appellant approximately $700. Although he could not specify when, Amos claimed he told appellant he was using a converted hood instead of a factory turbo hood.

On June 14, 1991, the repairs were completed, and appellant went to National to pick up his car. Amos said after appellant inspected the entire car, he expressed great pleasure with the quality of the repairs. Upon inquiring about payment, appellant told Amos he thought Bankers and Shippers had sent the insurance check directly to National. Amos then telephoned Bankers and

Shippers and was told the check had not been sent out yet but would be mailed directly to National the following week. According to Amos, approximately ninety-nine percent of the insurance companies National deals with send the insurance proceeds directly to National and not to the insured. Based on these factors, Amos said he allowed appellant to leave with the car. As appellant was leaving, Amos gave him a final bill for $6,049.27. Amos said the bill did not account for the deductible and that appellant only owed $5,049.27 for the repairs.

When Amos did not receive the insurance check the following week, he called Bankers and Shippers and was told the check had been sent to appellant. Amos spoke to appellant about his outstanding bill on June 21, 1991, when appellant showed up at his home complaining about four or five repairs with which he was not satisfied. According to Amos, appellant said he would pay the bill when all of the repairs were completed to his satisfaction.

Amos said the repairs about which appellant complained included the front bumper alignment, the side molding, and some slight chips in the paint on the roof. Amos said appellant did not say anything about the replacement hood. Anxious to receive payment and satisfy appellant, Amos said he told appellant he would make the requested repairs but that it would take a couple of days. Amos said he offered appellant the use of his mother-in-law's car as a "loaner" until the repairs were finished.

Appellant left in the "loaner," but returned within a few minutes claiming he had a family reunion to attend that day out-of-town. Not wanting appellant to take his mother-in-law's car out-of-town, Amos agreed to give appellant his car back, but made appellant promise he would bring the car back for the repairs so he could get paid. Amos said appellant never brought his car back and that when he called appellant to inquire, appellant told him one of his friends was going to make the repairs. Amos said he made numerous efforts thereafter to contact appellant about his outstanding bill, to no avail. Amos said appellant never offered him any amount of money for the repairs he had performed.

Consequently, in July 1991, Amos met with Cleveland Police Detective David Hancock, a personal friend, to see what could be done to get appellant to pay his bill. Amos did not file criminal charges against appellant at this time because Hancock suggested Amos give appellant more time to make restitution.

Hancock testified that Amos contacted him again in September 1991 to inform him appellant had still not paid the bill. In response, Hancock contacted the county prosecutor's office, related the facts to them, and then contacted appellant and asked to meet with him.

Hancock met with appellant at the Fifth District Detective Bureau. During their meeting, appellant told Hancock he was not happy with the repairs.

Hancock told appellant he was not interested in hearing about his dissatisfaction. After some further discussion, Hancock said appellant told him he would pay National within the next few days. Hancock said he told appellant that he had spoken with the county prosecutor's office and that if payment were not made within thirty days, he was going to take the matter to the grand jury.

After thirty days, Hancock contacted Amos and learned that appellant told Amos he was not going to pay the bill. Hancock tried several more times to contact appellant, but appellant never returned any of his telephone calls.

The state also called as a witness David Jacofsky. Jacofsky is an appraiser for Crawford and Company, specializing in automobile appraisals. Sometime around May 1, 1991, he received an assignment from Bankers and Shippers to go to National to do an appraisal of the damage to appellant's car. Jacofsky examined the car and found extensive damage to its left front. Jacofsky said the turbo hood needed to be replaced, and the cost of replacing a turbo hood was $1,621, which was the amount he authorized. Jacofsky did not know whether the hood that was damaged was an original factory turbo hood or a converted standard factory hood.

Jacofsky did not see the car again until sometime after he was subpoenaed to appear as a witness at trial. At the request of appellant's attorney, he met with appellant approximately one month before trial to re-examine the car. Jacofsky looked at the car for ten minutes and found that the paint on the front bumper did not match and was peeled and that a washer bottle and the hood were not original factory parts. Jacofsky did not find any alignment problem, although he did observe some problems with the roof and some of the moldings. Jacofsky stated, however, that he had never authorized any repairs for roof or molding damage. Jacofsky also stated that, in his experience, it was common for auto body shops to "cut corners" in order to save customers all or part of their deductible.

At the close of the state's case, the state renewed its pretrial motion to amend the indictment. Specifically, the state moved to amend the date of the offense listed on the indictment, June 14, 1991, to June 14, 1991 through October 15, 1991 or, in the alternative, from June 14, 1991 through June 21, 1991, inclusive. Appellant then moved the court for a judgment of acquittal pursuant to Crim.R. 29(A). The court took both motions under advisement. When trial reconvened, the court granted the state's motion to amend the indictment to conform to the evidence, changing the date of the offense from June 14, 1991 to June 14, 1991 through June 21, 1991, inclusive. Appellant did not request a continuance of the trial based upon the amendment. Appellant's motion for judgment of acquittal was granted in part. The court found the state's evidence insufficient to support

a conviction of grand theft (value over $5,000) but sufficient to support a conviction for felony theft under R.C. 2913.02 (value between $300 and $5,000).

Appellant elected to present a defense case and to testify. Appellant testified that when he initially met with Amos, he agreed to let Amos repair his car but told Amos he had to use all factory parts. Appellant explained that the car was a limited edition collectible, and, therefore, it was extremely important that only factory parts be used to maintain the car's full value. Appellant said that when Amos told him it could take a while to receive some of the parts, he told Amos that was not a problem as his primary concern was to have the job done right. Appellant said he was going to pay Amos whatever it cost to have the job done properly. Appellant denied that it was part of their agreement that Amos save him his insurance deductible. Appellant said Formicelli told Amos that appellant had a $1,000 deductible and inquired whether Amos could save appellant this expense. Appellant said when Amos indicated that he might be able to save him some money, he told Amos that would be fine, but he wanted the car fixed properly because of its value as a collector's item.

Appellant said when he picked up his car on June 14, 1991, he cursorily inspected it and was generally pleased with the repairs. Appellant said Amos gave him a bill for $6,049.27 and demanded that he pay the full amount. After telling Amos he thought Bankers and Shippers sent the check directly to National, appellant said he offered Amos $2,000 so he could have the car for the weekend. Appellant said he intended to pay Amos the other $4,000 when the insurance check came. Appellant claimed Amos did not want the $2,000 at that time but allowed him to take the car anyway. Appellant said Amos never agreed to accept the $5,049.27 proceeds check as payment in full.

Appellant testified that sometime between June 14, 1991, the day he picked up his car, and June 21, 1991, he took the car to a friend, who was an experienced auto body worker, and learned that Amos had replaced the damaged hood with a converted, standard Grand Prix hood, that the paint on the front bumper did not match and was peeling, and that the bumper was out of alignment. On June 21, 1991, appellant said he drove the car to Amos' home to inform him about these problems. According to appellant, when he complained about the hood not being an original, Amos denied it and told him he had sent an employee to Detroit, Michigan specifically to pick up the hood.

Appellant told Amos he had not yet received the insurance check but that he would not pay him until these problems were fixed. Appellant said Amos told him he could fix the problems in about fifteen minutes, but he needed to take the car into the shop.

Appellant said after he drove away in the "loaner," he thought about Amos' claim that the hood was an original, decided he could not trust him, and decided

to retrieve his car and take it to another body shop. To this end, appellant returned to Amos' home and told Amos he had a family reunion to attend later that day in Geneva, Ohio and that he needed his car. Appellant said he did, in fact, attend his family reunion later that day.

A few days later, appellant said he telephoned Amos and told him he had taken the car to three other body shops and had proof the hood was not a factory turbo hood. Appellant said Amos continued to deny the hood was not an original and demanded that he pay him $6,049.27. Appellant said he also told Amos that the car's frame had not been straightened out, that the bumper was probably an after-market, and that the bumper's surface had not been properly primed. Appellant claimed Amos told him these repairs were unnecessary. Relying on these other estimates, appellant said he offered to pay Amos between $2,500 and $3,000 for the repairs he did but that Amos said he would not take a penny less than $6,049.27.

Upon cross-examination, appellant acknowledged that he did not receive these other estimates until August 9, 1991. Appellant said he waited until then to give Amos a chance to resolve the dispute. Appellant further acknowledged that he had negotiated the insurance check shortly after he brought the car to Amos' home on June 21, 1991.

Appellant claimed that when he met with Hancock, Hancock told him "Jim Amos is his partner" and appellant had "better pay his partner the full $6049.27" or he would face criminal charges. Appellant said he called Amos after this meeting to try to resolve the matter. Appellant said Amos said, "Pay me the $6049.27 and this will be over." Appellant said he offered Amos $2,500 because the car still needed $3,000 worth of repairs but that Amos said, "It would be a cold day in hell before I take a penny less." Appellant said when he told Amos that perhaps the matter should be settled in civil court, Amos became angry and hung up on him.

At the close of the evidence, appellant renewed his Crim.R. 29 motion for judgment of acquittal. The trial court reserved ruling on the motion and indicated that it would rule as part of its overall decision. On July 20, 1992, the trial court overruled appellant's Crim.R. 29 motion and found appellant guilty of felony theft as in the amended indictment.

## II

I simply cannot agree with the majority's conclusion that appellant was denied his rights under Article I, Section 10 of the Ohio Constitution [1] when the trial

---

1. Section 10, Article I, Ohio Constitution provides, in part, as follows:

court allowed the state, pursuant to Crim.R. 7(D), to amend the indictment to change the date of the offense from June 14, 1991 to June 14, 1991 through June 21, 1991, inclusive, to conform to the evidence.

Crim.R. 7(D), which sets forth the procedure for amending indictments, provides in pertinent part as follows:

"*The court may at any time before, during, or after a trial amend the indictment,* * * * in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, *provided no change is made in the name or identity of the crime charged.* If any amendment is made to the substance of the indictment * * * or to cure a variance between the indictment * * * and the proof, the defendant is entitled to a * * * reasonable continuance, unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected by proceeding with the trial * * *[.]" (Emphasis added.)

In accord with Crim.R. 7, an indictment may be amended during trial provided the name or identity of the offense with which a defendant is charged does not change. *State v. O'Brien* (1987), 30 Ohio St.3d 122, 30 OBR 436, 508 N.E.2d 144. The majority is of the opinion that an amendment to the date of a theft offense, *ipso facto,* is a substantive change in the identity of that offense requiring further grand jury action. Such a position, however, is inconsistent with the weight of decisional law holding that an indictment is not *per se* invalid when dates and times are not included, or are stated incorrectly, if such information is not material to the conduct charged or necessary to the defendant in preparation of a defense. See *State v. Lawrinson* (1990), 49 Ohio St.3d 238, 239, 551 N.E.2d 1261, 1262; *State v. Sellards* (1985), 17 Ohio St.3d 169, 171, 17 OBR 410, 411–412, 478 N.E.2d 781, 784 ("Ordinarily, precise times and dates are not essential elements of offenses. Thus, the failure to provide dates and times in an indictment will not alone provide a basis for dismissal of the charges. A certain degree of inexactitude of averments, where they relate to matters other than elements of the offense, is not *per se* impermissible or necessarily fatal to a prosecution."); *State v. Wilson* (1972), 29 Ohio St.2d 203, 58 O.O.2d 409, 280 N.E.2d 915; *State v. Murrell* (1991), 72 Ohio App.3d 668, 672, 595 N.E.2d 982, 984; *State v. Ambrosia* (1990), 67 Ohio App.3d 552, 557, 587 N.E.2d 892, 895; *State v. Miller* (Dec. 6, 1993), Washington App. No. 92 CA 34, unreported, 1993 WL 524973; see, also, R.C. 2941.08 ("An indictment or information is not made invalid, and the trial,

---

"[N]o person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury * * *."

judgment, or other proceedings * * * affected: * * * (C) For stating the time imperfectly * * *.").

To successfully prove the theft charge in this case, the state was required to prove that appellant, with purpose to deprive National of property or services, knowingly obtained or exerted control over either the property or services without the consent of National or its authorized agent, or by deception. Time is not a substantive element of this theft offense and, therefore, was not an essential part of the indictment. Moreover, as far as any amendment to the date of the offense stated in the indictment is concerned, it was essential only that the amendment not change the name or identity of the offense charged. Unlike the majority, I do not believe that the date of a theft offense is inherently tied to the identity of that offense. In my opinion, there is simply no basis from which the conclusion can be reached, as does the majority, that by permitting the state to amend the indictment to expand its time frame by one week, the court, in effect, permitted the state to charge an additional, separate and distinct theft offense, i.e., one on June 21, 1991. Both before and after the amendment of the date of the offense, the indictment charged the same offense, theft of car repairs from National without its consent and/or by deception. Therefore, I would find that no further action by the grand jury was required.

Finally, I am unable to agree with the majority's statement that it is irrelevant under Crim.R. 7(D) whether the defendant suffers prejudice as a result of the amendment. See State v. O'Brien (1987), 30 Ohio St.3d 122, 30 OBR 436, 508 N.E.2d 144 (Ohio Supreme Court affirmed defendant's conviction for child endangering, holding that amendment to indictment to include the requisite element of recklessness did not change the nature or identity of the offense. Court said under such circumstances amendment is permitted absent a showing of demonstrated prejudice to the defendant).

Nor do I believe that State v. Dilley (1989), 47 Ohio St.3d 20, 546 N.E.2d 937, compels a different conclusion. Simply put, Dilley is the exception rather than the rule. In Dilley, the court held that the state cannot circumvent R.C. 2941.43, which requires the state to include in an indictment certain specifications as a mandatory condition to the imposition of an indefinite term of imprisonment, by resorting to Crim.R. 7. It was reasoned that R.C. 2941.43 was designed to preclude any question of prejudice to a defendant being placed in issue. It is in this situation, and this situation only, that the Ohio Supreme Court has dispensed with a showing of prejudice under Crim.R. 7. See State v. Richard (June 17, 1993), Cuyahoga App. No. 62645, unreported, 1993 WL 215382; Cleveland v. McClendon (Apr. 8, 1993), Cuyahoga App. No. 62045, unreported, 1993 WL 106953; State v. Bragg (June 27, 1991), Cuyahoga App. No. 58859, unreported,

1991 WL 127135; *State v. Johnson* (Mar. 28, 1991), Cuyahoga App. No. 57987, unreported, 1991 WL 41684.

In this case, there has been no showing that appellant was prejudiced by the amendment. I am compelled to point out that during the proceedings below, appellant did not even request a continuance after the court granted the motion to amend. Moreover, the record does not support the conclusion that the failure to provide appellant with the correct date of the theft was a material detriment to the preparation of his defense. Appellant's defense at trial was that he did not act with criminal purpose. In this regard, evidence of the date or time an offense is committed is irrelevant to the issue of whether a defendant charged with a theft offense acted with the requisite mental culpability.

Inasmuch as the amendment of the indictment did not change either the name or the identity of the offense charged and did not prejudice appellant by interfering with his ability to defend against the charge, the court acted properly when it permitted the amendment to be made. Accordingly, I would overrule appellant's first assignment of error.

## III

I also disagree with the majority's determination that the evidence was insufficient to support the theft conviction. It is now well settled that an appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to:

"[E]xamine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Citation omitted). *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. It is equally well settled that the credibility of the testimony and the weight of the evidence are primarily matters for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212.

In this case, the trial court found, beyond a reasonable doubt, that when appellant went to Amos' home on June 21, 1991 and retrieved his car, he knowingly obtained or exerted control over the car repairs and parts with the purpose to deprive National Auto of said property or services without its consent, in violation of R.C. 2913.02(A)(1). The court similarly found, beyond a reasonable doubt, that on June 21, 1991, appellant also knowingly and by deception obtained control over the car repairs and parts with the purpose to deprive National of said property or services, in violation of R.C. 2913.02(A)(3). My review of the

record reveals sufficient probative evidence to support the judgment of the trial court.

In my opinion, the fact that National never obtained a lien on the car is of no consequence to the determination of whether National was the "owner" of any "property or services" which could have been the subject of a theft offense. R.C. 2913.02(A)(1) does not require a mechanic to obtain a lien on a repaired car before it can be held that the mechanic owns the parts replaced or the services performed.

An "owner," for purposes of R.C. 2913.02, is defined in R.C. 2913.01(D) as:

"[A]ny person, other than the actor, who is the owner of, or who has possession or control of, or any license or interest in property or services * * *."

"Services," for purposes of R.C. 2913.02, include "[l]abor, personal services, [or] professional services * * *." R.C. 2913.01(E).

The state offered the testimony of Amos and a series of invoices from Classic Pontiac to demonstrate that Amos, on behalf of National, ordered and paid for parts which he then used to repair appellant's car. Indeed, appellant acknowledged that Amos performed at least $3,000 worth of work to his car. This evidence is sufficient to support the trial court's findings that National was the owner of property and services which were the subject of a theft offense.

I also disagree with the majority's opinion that the state failed to prove that appellant possessed the culpability necessary to commit theft, *i.e.*, that he acted with "purpose" to "deprive" National of any property or services.

A person acts purposely, under R.C. 2913.02, when it is his specific intention to cause a certain result. R.C. 2901.22(A). The purpose with which a person does an act is determined from the manner in which it is done, the means used, and all other facts and circumstances in evidence. *State v. Johnson* (1978), 56 Ohio St.2d 35, 10 O.O.3d 78, 381 N.E.2d 637.

The element of "deprive," as used in R.C. 2913.02, is defined in R.C. 2913.01(C) as the "accept[ance], use, or appropriat[ion of] money, property, or services, with purpose not to give proper consideration in return for the money, property or services, and without reasonable justification or excuse of not giving proper consideration."

Appellant testified that on June 21, 1991, after he drove away in the "loaner," he thought about Amos' claim that the hood was an original, decided he could not trust him, and decided to retrieve his car and take it to another body shop. Thus, appellant returned to Amos' home and told Amos he had a family reunion to attend later that day in Geneva, Ohio and needed his car for this purpose.

Appellant then telephoned Amos and falsely told him he had taken the car to three other body shops and had proof the hood was not a factory turbo hood, that the frame had not been straightened out, that the bumper was probably an after-market, and that the bumper's surface had not been properly primed. Appellant said he then offered to pay Amos between $2,500 and $3,000 for the repairs. Appellant acknowledged that he had negotiated the insurance check shortly after he brought the car to Amos' home on June 21, 1991.

One entirely reasonable inference to be drawn from this testimony is that appellant, who at that point had no idea what other repairs needed to be done to the car, if any, did not intend to pay National the agreed upon price for the repairs.

It was the function of the factfinder to weigh the evidence and assess the credibility of the witnesses in arriving at its finding as to this element of the offense. Where reasonable minds can reach different conclusions upon conflicting evidence, determination as to what occurred is a question for the factfinder. It is not the function of an appellate court to substitute its judgment for that of the factfinder. *State v. DeHass, supra.* Even assuming, for argument purposes only, that appellant's theory of innocence was reasonable, the factfinder was free to believe or disbelieve that theory. By finding appellant guilty, there is no question that the factfinder did not believe his theory of innocence. Thus, in applying the appropriate standard of appellate review, I conclude that a rational trier of fact could have found this essential element of the crime proven beyond a reasonable doubt.

I also disagree with the majority's finding that there is no evidence that appellant knowingly obtained or exerted control over any property or services without National's consent. Appellant asserts that when Amos relinquished the car to him on June 21, 1991 to attend his family reunion, National relinquished any and all interest it had in the car which could be the subject of a theft offense.

Appellant testified that when he returned to Amos' home on June 21, 1991, it was his intent to retrieve the car to have the outstanding repairs performed by someone other than National because he did not trust Amos. Rather than tell this to Amos, appellant told him he needed his car to attend a family reunion out-of-town. Not wanting appellant to drive his mother-in-law's car out-of-town, Amos did as appellant asked and gave him back his car. Before doing so, however, Amos made appellant promise to bring the car back for the repairs appellant said were needed. Appellant, by his own admission, told Amos he would pay his bill when these repairs were completed. This evidence is sufficient to support the trial court's findings that appellant knowingly obtained or exerted control over property or services without National's consent.

From a review of all of the evidence, it is my opinion that there was sufficient evidence going to each and every element of the crime of theft which, if believed, could convince the average mind that appellant was guilty beyond a reasonable doubt. Therefore, I would overrule appellant's second assignment of error.

## IV

Although not addressed by the majority, I would also overrule appellant's third assignment of error, wherein appellant contends that his due-process rights were violated when he was charged in a one-count indictment with theft without consent in violation of R.C. 2913.02(A)(1) and theft by deception in violation of R.C. 2913.02(A)(3). Appellant argues that charging him in this duplicitous manner rendered the indictment fatal because it failed to place him on notice that he was being charged with both types of theft since a charge for theft without consent is inconsistent with a charge of theft by deception which, according to appellant, is larceny with the consent of the owner.

It must be noted, at the outset, that appellant did not raise an objection to the adequacy of the indictment at the trial level. Under the provisions of Crim.R. 12(B),[2] it is incumbent upon the defendant, in order to preserve his right on appeal, to object to the indictment, before trial, on the grounds it was defective.

Where a party fails to interpose a specific objection to an indictment prior to trial, the purported error, if any, is waived, absent a finding of plain error. Crim.R. 52(B); *State v. Miranda* (Apr. 16, 1992), Cuyahoga App. Nos. 59924 and 59925, unreported, 1992 WL 79763; *State v. Maynard* (June 18, 1989), Cuyahoga App. No. 55413, unreported, 1989 WL 62042; *Cleveland v. Macasek* (Jan. 15, 1987), Cuyahoga App. No. 51441, unreported, 1987 WL 5446.

The Ohio Supreme Court has made it clear that courts of appeals should take notice of plain error charily, see *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, to correct only particularly egregious errors—those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings," *United States v. Atkinson* (1936), 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557, and then only when it can be said that, "but for the error, the outcome of the trial clearly would have been different." *State v. Watson* (1991), 61 Ohio St.3d 1, 6, 572 N.E.2d 97, 103; *State v. Craft* (1977), 52 Ohio App.2d 1, 6 O.O.3d 1, 367 N.E.2d 1221.

---

2. Crim.R. 12(B) provides, in relevant part, as follows:
   "(2) Defenses and objections based on defects in the indictment, information, or complaint (other than failure to show jurisdiction in the court or to charge an offense, which objections shall be noticed by the court at any time during the pendency of the proceeding) * * *[.]"

Turning now to consider the issue of whether the purported defect in the indictment at issue herein rendered appellant's theft conviction invalid, the Ohio Supreme Court has recognized that where a single offense may be committed in any one of two or more different ways, a count in an indictment which charges the commission of the offense conjunctively in two or more ways is not duplicitous, provided there is no repugnancy between the ways charged. *State v. Daniels* (1959), 169 Ohio St. 87, 8 O.O.2d 56, 157 N.E.2d 736.

In this case, there is no repugnancy between the averment that appellant purposely deprived National of property or services without its consent and the averment that appellant purposely deprived National of property or services by deception. Both averments may be true at the same time. See *State v. King* (July 18, 1989), Franklin App. Nos. 88AP–665 and 88AP–1082, unreported, 1989 WL 83577. A clear reading of R.C. 2913.02 and case law reveals that consent is not an element of, nor a defense to, the offense of theft by deception. *State v. Clifton* (1989), 65 Ohio App.3d 117, 583 N.E.2d 326; *State v. Richards* (Dec. 29, 1988), Cuyahoga App. No. 54888, unreported, 1988 WL 140558; *State v. Schnuck* (Jan. 26, 1983), Hamilton App. No. C–820232, unreported, 1983 WL 5402; *State v. Welles* (Oct. 2, 1985), Montgomery App. No. 8845, unreported, 1985 WL 6939.

Nevertheless, even if the indictment were duplicitous, the defect was not fatal. R.C. 2941.28 provides that "[no] indictment or information shall be quashed, set aside, or dismissed for any of the following defects: * * * (B) That there is a misjoinder of the offenses charged in the indictment or information, or duplicity therein."

To the extent that appellant argues that the indictment failed to adequately put him on notice that he was being charged with violations of both R.C. 2913.02(A)(1) and (A)(3), the indictment and the bill of particulars clearly apprised appellant that he was being charged with multiple violations of R.C. 2913.02 and that he would be required to defend against the charges that he committed theft without consent and/or theft by deception.

In light of the above, I would find that no error occurred, let alone plain error, and, accordingly, I would overrule appellant's third assignment of error.

For all the foregoing reasons, I would affirm the trial court's judgment.