OPINION
Darryl J. Honeycutt appeals from a judgment of the Montgomery County Court of Common Pleas, which found him guilty of two counts of menacing by stalking and one count of violation of a protection order and sentenced him to a total of eighteen months imprisonment.
The state's evidence established the following facts.
On May 2, 1999, Sallie Taylor, an anchor reporter with the W.H.I.O. television station ("WHIO"), received a voice mail message from Honeycutt stating that she had done a story on him. She returned his call and told him that she had not done such a story. However, Taylor continued to receive calls from Honeycutt, sometimes finding as many as six messages on her voice mail after a weekend. She also began to receive letters, as many as five in a one-month period. The letters stated that Honeycutt loved Taylor and wanted to be with her. Eventually, the letters began to become more frightening to Taylor, culminating with a package containing a letter stating that human beings did not have much time left, that the end was near, and that something would happen if Taylor and Honeycutt were not together.
As a result of that letter, Taylor's manager sent her to a hotel until Honeycutt could be located, and Taylor filed stalking charges and obtained a civil protection order ("CPO") against Honeycutt. The CPO was obtained on October 1, 1999, and Honeycutt was convicted of menacing by stalking on October 6, 1999. As a result of that conviction, Honeycutt was sentenced to the Dayton Human Rehabilitation Center. Despite his confinement, Honeycutt sent another letter to Taylor on October 30, 1999. She again filed stalking charges against Honeycutt. This time, he was found not guilty by reason of insanity and ordered to the Twin Valley Psychiatric Unit ("Twin Valley").
Honeycutt remained at Twin Valley, and Taylor had no contact from him until she learned that he was to be released from Twin Valley on September 8, 2000. Upon learning of Honeycutt's release, WHIO sent Taylor to a hotel and hired bodyguards from ASET Corporation ("ASET") to follow her twenty-four hours a day until Honeycutt was located. Taylor also arranged to have a security system installed at her home. September 8, 2000 was a Friday. On Monday, September 11, 2000, Taylor anchored WHIO's morning news show. She testified that this would have been Honeycutt's first opportunity to see her on television following his release. After finishing the morning show at 9:00 a.m., Taylor went home to check on the installation of her security system. While she was gone, at approximately 10:00 a.m., ASET employees called Honeycutt's mother's home pretending to be selling windows in an effort to ascertain whether Honeycutt was there. Honeycutt answered the phone and spoke to the ASET employee.
Taylor returned to the station to meet with her managers and the ASET employees. At approximately 1:00 p.m., she checked her voice mail, finding the following message from Honeycutt: "Hi. You did a good job in the morning there and I like the new do. It looks good. Uh . . . so I'll call you and talk to ya' later, Baby." The message had been received at 9:31 a.m.
As a result of the above message, Dayton Police Officer Jonathan Miniard went to the home of Honeycutt's mother to find Honeycutt sitting on the porch. Honeycutt informed Officer Miniard that Taylor had called him. Honeycutt was interviewed on September 12, 2000 by Detective Doyle Burke. He told Detective Burke that Taylor had called him at approximately 9:30 a.m. on September 11, but that he had not answered the phone. He had known it was her because her name and number had come up on his Caller I.D.
Honeycutt was indicted on September 14, 2000 with two counts of menacing by stalking and violation of the CPO. The state filed a bill of particulars on January 10, 2001. A bench trial was held on June 18, 19, and July 13, 2001. The trial court found Honeycutt guilty on both counts of menacing by stalking and violation of the CPO. Honeycutt was sentenced to six month terms of imprisonment for violation of the CPO and one of the menacing by stalking charges and to eighteen months for the second count of menacing by stalking. The sentences were ordered to be served concurrently, for a total of eighteen months imprisonment.
Honeycutt appeals, raising three assignments of error.
 "I. WHEN THE COURT PERMITTED THE STATE TO AMEND THE INDICTMENT DURING APPELLANT'S TRIAL, HE WAS DENIED HIS RIGHT TO BE TRIED ON THE SAME ESSENTIAL FACTS FROM WHICH THE GRAND JURY FOUND PROBABLE CAUSE."
Under this assignment of error, Honeycutt argues that the court erred in allowing the state to amend the indictment on the second day of trial. The indictment, which had referred to events "on or about September 11, 2000," was amended to refer to events "between April, 1999 and September 11, 2000."
Crim.R. 7(D) governs the amendment of indictments. It provides:
 "The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged. If any amendment is made to the substance of the indictment, information, or complaint, or to cure a variance between the indictment, information, or complaint and the proof, the defendant is entitled to a discharge of the jury on the defendant's motion, if a jury has been impanelled, and to a reasonable continuance, unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected by proceeding with the trial, or by a postponement thereof to a later date with the same or another jury. * * *"
Crim.R. 7(D) embodies the protections guaranteed by Section 10, ArticleI, of the Ohio Constitution, which: "guarantees the accused that the essential facts constituting the offense for which he is tried will be found in the indictment of the grand jury. Where one of the vital elements identifying the crime is omitted from the indictment, it is defective and cannot be cured by the court as such a procedure would permit the court to convict the accused on a charge essentially different from that found by the grand jury." State v. Strozier (Oct. 5, 1994), Montgomery App. No. 14021, at *2, quoting State v. Headley (1983),6 Ohio St.3d 475, 478-79, 453 N.E.2d 716.
An amendment that changes the name or identity of the offense charged constitutes reversible error, regardless of whether the defendant can show prejudice. See id. For amendments that do not change the name or identity of the offense charged, the defendant is entitled to a continuance "unless it clearly appears from the whole of the proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made." Id, quoting Crim.R. 7(D).
The amendment in this case did not change the name or identity of the crime charged. Honeycutt was charged with menacing by stalking, and the amendment to the indictment did not change that fact. However, the amendment did change the date of the alleged pattern of conduct for which Honeycutt was charged. Honeycutt cites State v. Vitale (1994),96 Ohio App.3d 695, 645 N.E.2d 1277, for the proposition that a change in the date of the offense is a change to the identity of the crime. InVitale, the defendant had been charged with committing a crime on June 14, 1991. The indictment was subsequently amended to include actions between June 14, 1991 and June 21, 1991. The court in Vitale concluded that the amendment was a change to the identity of the crime because the indictment was changed to include completely different crimes that occurred at a different time and a different place. See id. at 700-01.
We believe that the instant case is distinguishable from Vitale in two key respects. First, Honeycutt was charged with a pattern of conduct. Amending the indictment to include incidents occurring between April of 1999 and September 11, 2000 did not change the fact that he was charged with a pattern of conduct. The amendment in Vitale added separate crimes to the indictment for which the defendant had not been charged. See id. Second, the bill of particulars in this case put Honeycutt on notice that the state would be including incidents occurring prior to September 11, 2000. The bill of particulars alleged that the September 11, 2000 phone call "and the events of the prior conviction" constituted a pattern of conduct under R.C. 2903.211. In Vitale, the bill of particulars referred only to June 14, 1991. See id. at 700. Furthermore, Vitale stands for the proposition that the state "should be restricted in its proof to the indictment and the particulars as set forth in the bill." Id., citingState v. Miller (1989), 63 Ohio App.3d 479, 485-86, 579 N.E.2d 276. The state in this case did restrict its proof to the indictment and the bill of particulars. Therefore, we conclude that the amendment did not change the identity of the crime.
While Honeycutt may have been entitled to a reasonable continuance based on the amendment, he failed to request one. Therefore, we will not consider whether he was entitled to it.
For the foregoing reasons, we find that the trial court did not err in allowing the state to amend the indictment.
The first assignment of error is overruled.
 "II. APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
Under this assignment of error, Honeycutt appears to make both a sufficiency of the evidence argument and a manifest weight of the evidence argument. Therefore, we will review the facts under both standards. An appeal based on sufficiency of the evidence requires us to consider whether any rational trier of fact could have found that the evidence presented by the prevailing party was sufficient to justify the trial court's decision. See State v. Thompkins (1997), 78 Ohio St.3d 380,386-87, 1997-Ohio-52, 678 N.E.2d 541; see also State v. Jenks (1991),61 Ohio St.3d 259, 273, 574 N.E.2d 492. When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins, supra, at 387, citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." Martin, supra, at 175.
Honeycutt points to several respects in which he argues that his conviction was based on insufficient evidence or against the manifest weight of the evidence. First, he reasserts his above argument that the indictment was defective. Second, he argues that the state presented insufficient evidence that he had engaged in a "pattern of conduct" under R.C. 2903.211. Third, Honeycutt argues that his identity as the perpetrator was not supported by the evidence. Fourth, he argues that the evidence did not support that he had the culpable mental state. Finally, he argues that the evidence did not show that Taylor had sustained any mental distress.
We have addressed Honeycutt's argument that the indictment was defective above; therefore, we will turn to Honeycutt's second argument, that the manifest weight of the evidence established that he had not engaged in a "pattern of conduct" as required under R.C. 2903.211. That statute provides: "No person by engaging in a pattern of conduct shall knowingly cause another to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." R.C. 2903.211(A). "Pattern of conduct" is defined as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1).
Honeycutt argues that, because he made no contact with Taylor from October of 1999 to September 11, 2000, he did not engage in a pattern of conduct. He contends that the approximately ten-month period between the October 1999 contact and the September 11, 2000 contact makes these incidents not "closely related in time." The state counters, and the trial court concluded, that because Honeycutt was confined in the Twin Valley Psychiatric Unit during those months, the incidents can be considered "closely related in time."
R.C. 2903.211 does not specifically state what constitutes incidents "closely related in time." Thus, whether the incidents in question were "closely related in time" should be resolved by the trier of fact "considering the evidence in the context of all the circumstances of the case." State v. Dario (1995), 106 Ohio App.3d 232, 238, 665 N.E.2d 759. The trial court in this case determined that Honeycutt's confinement in a mental institution was a factor supporting a finding that the September 11, 2000 call had been closely related in time to the events in 1999. The trial court's decision was not in error given the facts of this case. The evidence established that Honeycutt had called Taylor only three days after being released from confinement, that her fear of him had not lessened, and that he had called her immediately after his first opportunity to see her on the news following his release. While Honeycutt argues that the state did not present evidence that he had been unable to contact Taylor while confined, it can be reasonably inferred that, while confined for stalking Taylor, Honeycutt was not provided with the means to call her. Therefore, the trial court's decision on this point was supported by sufficient evidence and was not against the manifest weight of the evidence.
Honeycutt next argues that his identity as the caller was against the manifest weight of the evidence. We disagree. Honeycutt presented the testimony of his brother, sister-in-law, and friend that the voice on the tape was not Honeycutt's. Furthermore, Honeycutt's mother testified that he had been in the shower at the time of the call, and Honeycutt produced telephone records of incoming calls to the station that did not show a call from his number.
The state, however, presented testimony from Taylor, two ASET employees, and Honeycutt's former probation officer that the voice on the tape was Honeycutt's. It was shown that the testimony of Honeycutt's mother was inconsistent with her statements to the police directly after the incident, at which time she stated that he had not been at home at the time of the call. The state presented the testimony of Detective Burke, who testified regarding his interview with Honeycutt in which Honeycutt had been aware of the events of September 11, 2000 and had stated that Taylor had called him. Finally, the state presented testimony from an employee of Ameritech from which the trial court could have concluded that the list of phone calls to the station had been incomplete.
The trial court determined that the state's witnesses were more credible than Honeycutt's witnesses. As the finder of fact, these credibility determinations were for the trial court. Given the obvious bias and inconsistent statements of the defense witnesses, the trial court did not err in accepting the state's version of events. Thus, the trial court's determination that Honeycutt had made the call to Taylor was not against the manifest weight of the evidence.
Honeycutt's fourth argument is that the state presented insufficient evidence to show that he knowingly caused Taylor to believe that he would cause physical harm or mental distress to her. He argues that the September 11, 2000 phone call was not facially threatening, that, due to his mental condition, he did not know the call would distress her, and that his call was the response to a "volley of calls" from ASET, which Honeycutt believed came from Taylor due to the station's number coming up on his caller I.D.
R.C. 2901.22(B) provides that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of the circumstances when he is aware that such circumstances probably exist."
R.C. 2903.211 does not require that explicit threats be made against the victim. See Dayton v. Davis (1999), 136 Ohio App.3d 26, 31,735 N.E.2d 939; State v. Smith (1998), 126 Ohio App.3d 193, 200,709 N.E.2d 1245. Thus, the fact that the September 11, 2000 phone call was not facially threatening does not negate that Honeycutt knowingly caused Taylor to believe that he would cause her physical harm or mental distress. Furthermore, the state presented ample evidence to establish that Honeycutt had had the required mental state. Taylor had repeatedly told Honeycutt not to call or write her anymore and that it distressed her. Honeycutt had previously been the defendant in two cases regarding his stalking of Taylor. He had been confined in a mental institution for that reason. Taylor had obtained a CPO against him. Honeycutt's statements to Detective Burke support a finding that he knew that Taylor did not want him to contact her and that he should not do so. Finally, Honeycutt's argument that he called Taylor as a response to the "volley of calls" from the station is unpersuasive as the "volley of calls" did not ensue until after the call Honeycutt made to the station. Therefore, the state presented sufficient evidence from which the trial court could have determined that Honeycutt had acted knowingly, and the court's decision on that point was not against the manifest weight of the evidence.
Finally, Honeycutt argues that the state presented insufficient evidence that Taylor had suffered mental distress. "Mental distress" is defined as "any mental illness or condition that involves some temporary substantial incapacity or mental illness or condition that would normally require psychiatric treatment." R.C. 2903.211(D)(2). However, Honeycutt's argument misinterprets the statute. The statute does not require that Taylor have suffered mental distress, just that she believed that he would cause her physical harm or distress. See Davis, supra, at 32. Taylor clearly was afraid that Honeycutt would cause her physical harm. She went to a motel, hired bodyguards, installed a home security system, pressed charges three times, and testified that she had, in fact, been in fear for her safety. This is sufficient evidence that Honeycutt's behavior caused her to believe that he would cause her physical harm.
For the above reasons, we find that the state presented sufficient evidence from which the trial court could convict Honeycutt of menacing by stalking and that the conviction was not against the manifest weight of the evidence.
The second assignment of error is overruled.
 "III. INEFFECTIVE ASSISTANCE OF COUNSEL DEPRIVED APPELLANT OF HIS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION."
Under this assignment of error, Honeycutt argues that his trial counsel was ineffective in failing to move to suppress his statements to police.
We evaluate ineffective assistance of counsel arguments in light of the two prong analysis set forth in Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. See id. at 2064-65. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. See id. at 2064. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. See id. at 2065.
In considering whether counsel was ineffective in failing to file a motion to suppress, Honeycutt must establish that the motion was meritorious and that he suffered actual prejudice. See Kimmelman v.Morrison (1986), 477 U.S. 365, 375, 106 S.Ct. 2574, 2583.
Honeycutt argues essentially that he was unable to voluntarily make statements to the police due to his mental condition. In reviewing whether Honeycutt's statements were voluntary, we must determine whetherMiranda warnings were given and waived voluntarily, knowingly, and intelligently and whether the statements were made voluntarily. SeeState v. Clark (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844. While these are separate issues, both require us to determine whether the statements were voluntary under the totality of the circumstances. See id. The totality of the circumstances includes "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." State v.Edwards (1976), 49 Ohio St.2d 31, 40-41, 358 N.E.2d 1051, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3147. Thus, the mental condition of Honeycutt is a factor in determining whether his statements were voluntary; however, his mental condition does not render his statement involuntary where his mental condition was not exploited by the state in obtaining his statement. See Colorado v. Connelly (1986),479 U.S. 157, 164-65, 107 S.Ct. 515, 520-21.
In the case sub judice, Honeycutt's mental condition was not exploited by the police in obtaining his statement. He was advised of and waived his Miranda rights, signing a written waiver form. Furthermore, Detective Burke was unaware of Honeycutt's mental condition when interviewing him and therefore could not have sought to take advantage of it. Honeycutt's behavior during the interview with Burke gave no indication of a mental condition. Honeycutt was able to provide identifying information and recount information regarding the events of September 11, 2000. He was further aware of the CPO and his prior convictions. Honeycutt was not mistreated or threatened in any way, and he had had prior experience with the police. Therefore, we conclude that the totality of the circumstances surrounding Honeycutt's statements to the police indicate that those statements were made voluntarily following the knowing, voluntary, and intelligent waiver of his Miranda rights. As such, a motion to suppress would have been unsuccessful, and Honeycutt's trial counsel did not fall below the standard of care in failing to file such a motion.
The third assignment of error is overruled.
The judgment of the trial court will be affirmed.
BROGAN, J. and GRADY, J., concur.