The STATE of Ohio, Appellee,

v.

KEITH, Appellant.

[Cite as *State v. Keith* (1999), 136 Ohio App.3d 116.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–990034.

Decided Oct. 15, 1999.

*Michael K. Allen*, Hamilton County Prosecuting Attorney, and *Thomas J. Boychan*, Assistant Prosecuting Attorney, for appellee.

*Joseph E. McCright*, for appellant.

GORMAN, Presiding Judge.

The defendant-appellant, Victor E. Keith, appeals his conviction for theft (R.C. 2913.02). In his sole assignment of error, he argues that his conviction was not supported by sufficient evidence and was contrary to the manifest weight of the evidence. Because we agree that the trial court lost its way in weighing the evidence, we reverse.

I

Keith checked into the Red Roof Inn in Kennedy Heights (Cincinnati, Ohio) on October 5, 1998. Upon checking in, he signed a registration slip, with a driver's license number attached, and indicated that he would be staying until October 17. Language on the registration slip stated that the registrant agreed "to pay for all charges incurred with respect to my room including any damages to the premises, by the method listed above." Although Keith indicated on the slip that the method of payment would be with a credit card, he paid cash for the room on a daily basis through October 8.

Loretta Cephus, Keith's mother, testified that on October 9 she contacted the motel and informed personnel that she wanted to "take full responsibility for my son's bill." She stated that she talked to motel personnel "several times to confirm [her request] with several different people." Her purpose, she testified, was to "lighten my son's load financially." She said that her request to assume payment included payment for telephone bills, food, even room service—"whatev-

er is incurred." She testified also that she spoke to her son and told him of her plan to assume his motel bill.

As a result of her contact with the motel, Cephus was faxed a document called a "third-party credit card authorization." She filled it out and faxed it back to the motel. The motel placed the authorization on record.

An employee of the motel, Kenya Nicole Bush, testified that the "last day technically" that Keith was at the motel was on October 14. On October 15, she testified, he was not in his room and the key was left on the credenza. She testified that she put him down as a "room skip" because she had no way of getting in touch with him. She testified that motel records demonstrated that on October 12 Cephus's credit card was charged an amount of $156. She testified that she surmised that the reason why Cephus's credit card was charged on the twelfth was that someone was told that Keith was checking out on that day. In this regard, she testified that she did not see Keith on either October 13 or 14 and that it was "possible" that he was no longer staying at the motel on those dates.

The motel manager, Andrew G. Krum, testified that the "eviction" of Keith, as he referred to it, occurred on October 14. At that point, Krum testified, Keith "owed us a rather large sum of money." He stated that the motel had "extended his grace period, so to say, out of the goodness of our hearts." He stated that on October 15 Keith was "scheduled to pay" and that "he [Keith] said she [Cephus] was paying for the room on the fifteenth." On October 15, however, when someone from the motel again tried to debit Cephus's credit card, the card was refused authorization for further charges. According to Krum, the credit card was not authorized for any payment other than the $156.90 that was posted on October 12. Krum testified that "[w]e explained to [Keith] we needed payment for the rest of the room."

Krum stated that he had no further discussions with Keith on October 14 or 15 because "his mother got involved" and Keith "was not around for me to be able to discuss [matters] with him." He denied ever giving Keith his consent to leave the motel without making the final payment on his bill. He stated that Cephus called on the morning of October 15 and asked to speak to him. He stated that he explained to Cephus that he could not get additional authorization on her credit card. He then testified, "She said she would come down to Cincinnati, she was actually in Dayton, and pay for the charge. And she asked what time she had to be down. I told her that she had to be down by 12:00 check-out time and that if I had not received payment by 12:00 I was going to say he was checked out and I was going to bring charges by bringing the police in to file charges for theft."

Krum testified that he assumed that Cephus was unsatisfied with his response because she then spoke to the secretary of the corporate office at Red Roof Inn ("Red Roof"). He testified, "When I spoke with Mrs. Cephus the last time, she explained to me that she was not satisfied with [the corporate office's] explanation. She was not going to be able to come down and pay at 12:00. And I explained to her I was going to go ahead and pursue charges against Mr. Keith."

Cephus, for her part, denied that the motel manager had informed her that there was a balance owed on the account. She also denied that the motel manager instructed her to be in Cincinnati to make payment on the account by noon on October 15.

Keith testified that he did not stay in the motel room on the night of October 12, 13, 14, or 15. (State's Exhibit No. 3, however, logged a telephone call from Keith's room to Cephus's number on October 13.) When asked if he informed anyone before leaving the premises, he answered, "I was locked out of my room, so they knew that I was no longer [there]." The court then asked Keith if October 12 was the only day that he was locked out. He responded that he had been locked out several times.

The total amount left owing to the motel, if it is assumed that Keith stayed until October 15, was $203.01. The amount remained unpaid at the time of trial.

## II

The trial court issued a written decision in which it found Keith guilty of theft. The trial made several findings of particular relevance. First, it found that the motel tried to charge Cephus's credit card on October 9—a date even the state concedes is wrong.

Second, the trial court specifically disagreed with the defense argument that the third-party credit-card authorization necessarily meant that Keith had "no criminal intent to steal when he himself covertly left the hotel without paying the bill." The court stated, "There is no testimony in this case that Ms. Cephus ever communicated her commitment to pay the hotel charges to her son prior to his departure from the hotel." In a footnote, however, the trial court added, "Arguably, if the testimony offered at trial demonstrated that defendant Keith had been aware of his mother's commitment to pay the bill, the specific criminal intent required to [be] shown here, may have been absent."

The trial court next determined that Krum had never spoken to Keith about his bill and that no motel personnel had ever spoken to him about "his mother's authorization." The trial court also determined that the motel had never agreed, even upon accepting Cephus's third-party authorization, to relieve Keith of his personal responsibility for the bill. The trial court came to the following conclusion:

"Specific intent to steal in this matter is demonstrated by the fact that defendant committed in writing to pay for all charges, that he stayed in a room at the Red Roof Inn, thereby receiving services of the inn and subsequently departed the premises without notifying the hotel of his departure or paying the bill for services that he had received."

Accordingly, the trial court found Keith guilty of theft.

## III

In order for Keith to have been found guilty of theft, it was the state's burden to prove that Keith knowingly committed a theft of Red Roof's services. Keith argues that the evidence was insufficient to find criminal intent, or, alternatively, that the trial court's finding of criminal intent was contrary to the weight of the evidence. We agree with the latter proposition—that the finding of guilt was against the weight of the evidence. Therefore, we reverse.

█ As the Ohio Supreme Court has observed, a challenge to the sufficiency of the evidence is basically a legal challenge to whether the evidence is adequate to sustain a conviction. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541, 546. The test does not ask whether the state's evidence is to be believed, but, if it is believed, whether the evidence can support a finding of guilt. *Id.* at 390, 678 N.E.2d at 549 (Cook, J., concurring).

█ A challenge to the weight of the evidence, on the other hand, requires that the appellate court sit as a "thirteenth juror" and weigh the evidence to determine whether, in resolving conflicts in the evidence, the trial court lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387, 678 N.E.2d at 546–547.

█ We hold that there was sufficient evidence to sustain Keith's conviction, assuming that the trial court believed that he stayed at the motel beyond October 12, incurred additional expenses, and then left without checking out or making any inquiry about his balance. In this regard, we note that Krum, in discussing the limited authorization of Cephus's credit card, stated, "The credit card was charged with total authorization we had available on the card for $156.90. At that time, Mr. Keith's balance was $242.88. *We explained to him we needed payment for the rest of the room.*" (Emphasis added.) This testimony, despite its seeming importance to the state's case, was curiously unexplored by subsequent questioning. It is unclear when this particular discussion supposedly took place. This testimony does tend to show, however, depending upon the weight given to it, that Keith left knowing that he still owed on his bill. It bears observing, too, that Keith's credibility was damaged by the room bill showing a telephone call to Cephus on October 13, which contradicted his testimony that he vacated the motel on October 12. Cephus's credibility was questionable, also, in

light of her testimony denying that she ever had a discussion with Krum regarding the unpaid account.

There is absolutely no evidence, it should be pointed out, that Keith did not settle the bill because he ran completely out of money. Keith did not in any way suggest, or proffer as a defense, that he left without paying because he did not have funds. (Even if he had run out of money, that would still not explain why, after Krum had told him that his mother's credit card had not fully satisfied the bill, he left without making additional arrangements for payment.) Cephus, in fact, testified that Keith was "not really having a problem with his bill" when, in her words, "I took it upon myself * * * to try and lighten his load." Finally, as the trial court correctly found, there is no evidence of record that, in accepting the third-party credit-card authorization from Cephus, the motel agreed to a novation that released Keith from his responsibility for paying.

We do agree with Keith, however, that the trial court clearly lost its way in weighing the evidence. Crucially, the trial court appears to have overlooked the evidence that Cephus telephoned Keith to inform him that she had signed a third-party credit-card authorization for his bill. In its written decision, the trial court stated that there was "no testimony" to this effect, which is simply wrong. The importance of this error to the trial court's analysis is revealed by its own footnote, in which it stated that if there had been such evidence (which there was), then the proof of criminal intent may have been lacking. The trial court was further wrong, as even the state concedes, in concluding that Cephus's credit card was charged on October 9, rather than October 12—the same day that Keith said that he had vacated the motel. This error is crucial because it made it impossible to accept the defense theory that the authorization on Cephus's credit card was found to be insufficient to cover the bill only after Keith had already left. Finally, the trial court's finding that neither Krum nor other motel personnel ever had a discussion with Keith regarding "his mother's authorization" also appears to be at odds with the evidence.

We hold, therefore, that the trial court's miscomprehension of the evidence in this case demonstrates that it clearly lost its way in determining Keith's culpability. Accordingly, exercising our discretionary power to grant a new trial, we reverse Keith's conviction based upon the weight of the evidence and remand this cause to the trial court for further proceedings in accordance with the terms of this decision.

*Judgment reversed*
*and cause remanded.*

SUNDERMANN, J., concurs.

PAINTER, J., concurs in part and dissents in part.

PAINTER, J., concurring in part and dissenting in part.

I concur in the reversal. I dissent as to the remand. I would hold that Keith's conviction was against the manifest weight of the evidence *and* based on insufficient evidence. We should discharge the defendant. If money is owed, a civil case may be filed.

Criminal charges should never have been brought, the case should never have been prosecuted, the defendant should not have been convicted, and the case should not be remanded to continue the chain of error.

This case is another example of overuse of the criminal law.[1] When the trial judge's opinion discusses words like "novation" (a contract term), it is a sure tip-off that the matter is essentially civil in nature. The motel was happy to look to the mother's credit card, which was evidently valid, until it found out that the limit had been reached after some amounts were charged and collected against it. Then, no prosecution would have been commenced if the mother had appeared by a deadline with cash or a usable credit card.

The defendant had probably run out of money, relying on his mother's credit card, as did the motel. While it is true that he originally signed the registration slip agreeing to pay the charges (this sounds like a contract), he could only be guilty of a crime if he either intended not to pay or continued to use the motel's services when he knew that he would not or could not pay. Crimes generally require criminal intent—even the manager testified that the charge would not have been filed if the mother had appeared by the "deadline." But by then, under any possible theory of guilt, the crime had already been committed. Whatever the defendant's credibility, the state's evidence alone, at its best construction, was insufficient. Under no construction of the evidence can I find criminal conduct.

Criminal prosecution should be reserved for criminals. We cheapen it by making everyone a criminal.

---

1. See, *e.g., United States v. Hodge* (C.A.9, 1998), 150 F.3d 1148; *State v. Vitale* (1994), 96 Ohio App.3d 695, 645 N.E.2d 1277; *State v. Howell* (1994), 64 Ohio Misc.2d 23, 639 N.E.2d 531; *State v. Cote* (1991), 62 Ohio Misc.2d 202, 594 N.E.2d 198; *State v. Fyffe* (1990), 67 Ohio App.3d 608, 588 N.E.2d 137; *State v. Glenn* (1990), 56 Ohio Misc.2d 1, 564 N.E.2d 1149.