[Cite as *State v. Coker*, 2023-Ohio-4339.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio

       Appellee

v.

Stephen Coker, Jr.

       Appellant

Court of Appeals No. WD-22-054

Trial Court No. 2021CR0180

**<u>DECISION AND JUDGMENT</u>**

Decided: December 1, 2023

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Chief Assistant Prosecuting Attorney, and
James A. Hoppenjans, Assistant Prosecuting Attorney, for appellee.

Felice Harris, for appellant.

* * * * *

**SULEK, J.**

**{¶ 1}** Appellant, Stephen Coker, appeals the August 18, 2022 judgment of the

Wood County Court of Common Pleas which, following a jury trial finding him guilty of

three counts of rape, sentenced him to an indefinite prison sentence of 9 to 10 and 1/2

years. Because the state failed to present sufficient evidence to support the convictions,

the judgment is reversed and Coker's convictions are vacated.

## I. Facts and Procedural History

{¶ 2} On April 8, 2021, the Wood County Grand Jury indicted Coker on three counts of rape, R.C. 2907.02(A)(2) and 2907.02(B), of his wife, S.O. The indictment alleged that acts of rape occurred on January 30, 2019, between April 1, 2019 to September 1, 2019, and between January 1, 2020 to June 14, 2020. Coker entered not guilty pleas.

{¶ 3} The case proceeded to a jury trial and the following evidence was presented. S.O. testified that she met Coker in November 2014 when he travelled from Ohio to Texas for a religious conference. They married approximately four months later, and S.O. and her two children then moved from Texas to Toledo, Ohio. After one year, the family moved to Rossford, Wood County, Ohio.

{¶ 4} S.O. testified that after moving to Rossford in 2016, she and Coker would have sex most nights and often had multiple sexual encounters on the same night. S.O. stated that the sexual encounters began "wearing" on her and that she discussed this issue with Coker.

{¶ 5} On Saturday nights, S.O. stated that she and Coker would have what they termed "date nights," which involved going out to dinner then returning home to play board games, listen to music, and drink alcohol. The couple would also have sex on date nights and, according to S.O., multiple sexual encounters were expected. S.O. testified that, "generally speaking," the first "sexual encounter" of these date nights was

2.

consensual but "[a] lot of times we would like fall asleep and then I would wake up to him either going ahead and inserting himself inside me or I would wake up to him on top of me. I've woken to him pulling me to the end of the bed to have sex." S.O. later clarified:

> Q: Were there ever times that you woke up and he was performing oral sex on you?
>
> A: Yes.
>
> * * *
>
> Q: You said that sometimes you would wake up and he would already be penetrating you?
>
> A: Uh-huh.
>
> Q: I don't mean to be graphic but, specifics, when you say penetrating you does that mean putting his penis in your vagina?
>
> A: Correct. I was laying on my side.

{¶ 6} S.O. stated that when these incidents occurred, "[a] lot of times I would say no or I would try to push him off or try to just go back like I'm going to bed." Coker justified his actions by stating that a wife was supposed to submit to her husband and that the Bible or scripture provides that nothing is "defiling in marriage;" in other words, between married couples there was nothing off-limits in the bedroom.

3.

{¶ 7} On date nights, S.O. and Coker would sometimes consume alcohol to the point of intoxication. Later in their relationship they began smoking marijuana. S.O. testified that she occasionally blacked-out due to intoxication but later surmised that they had had sex because her vagina was sore and swollen. S.O. clarified that this pattern of near-daily sexual encounters spanned the couples' 2016 move to Rossford until January 2019. During that time, the couple had a son.

{¶ 8} S.O. testified that on January 30, 2019, her birthday, and into the early morning of January 31, after "having being [sic] intimate with [Coker]* * * I said no, and we had sex again and I laid there crying." The prosecutor then asked:

Q: So you had sex multiple times that night, you had told him no, and he had sex with you anyway?

A: Yes.

{¶ 9} The next day, S.O. flew to Texas to stay with family and "collect herself." At that time, S.O. blamed her drinking for Coker's sexual conduct. After five to seven days, S.O. returned home and the number of "sexual encounters" decreased for approximately a month. More specifically, S.O. testified:

Q: When you came back after five or seven days, did things improve with respect to your sexual encounters with Stephen?

A: Yes.

Q: Were they less frequent?

4.

A: Yes, in the beginning.  Uh-huh.

Q: Was he forcing you to have sex multiple times a night?

A: In the beginning, no.

Q: Did it stay that way for very long?

A: Possibly like a month.

Q: So by summertime were you back to the old cycle of several times a week and several times a night when you didn't want to?

A: More on weekends.

{¶ 10} S.O. confirmed that during this timeframe—which would have been sometime in the spring through the summer of 2019—she started sleeping in the living room to "try to prevent having to have sex with Stephen."

{¶ 11} In January 2020, "the repeated cycle of sexual encounters" were mostly limited to the weekends; specifically, Saturday date nights.  S.O. testified that on May 7, 2020, she and Coker were playing a board game and listening to music in the bedroom. "We were having a good time playing old school music and we engaged in sexual activity and it began to get a bit rough."  S.O.'s back began to burn from the carpet.  She told him to stop but he had her pinned under him with her knees to her chest.  A photo depicting the bruise along her spine was admitted into evidence.

{¶ 12} In June 2020, S.O. again left for Texas, taking the children with her.  She stated that her decision to leave was based on the fact that Coker failed to follow through

5.

on his promise to change his behavior.  S.O. testified that she asked Coker for two weeks to allow her a break and time for counseling.

{¶ 13} After a court recess, S.O. was directly questioned about the various sex acts to which she did not consent, but without regard to any specific timeframe.  The following testimony was presented:

Q: [S.O.] we talked about some of the sex acts that occurred when you did not consent to them.  We talked about vaginal sex, oral sex.  Were there any other sex acts that occurred during those episodes that you were not comfortable with?

A: Yes.

Q: What was that?

A: Anal.

Q: What do you mean by anal?

A: With his male part going into my anus.

Q: His penis into your anus?

A: Yes.

* * *

Q: Was there a time that you consented to trying it?

A: Yeah.  I had made a try, yeah.

6.

Q: Okay. After that attempt did you express to him that you did not want to try again?

A: Yes.

Q: Were there times that despite your protests he attempted to have anal sex with you again?

A: Yes.

{¶ 14} The state then redirected S.O.'s testimony back to June 2020, the topic preceding the recess, and recordings made of two video conversations between S.O. and Coker. In the recordings, when confronted with the unwanted sexual activity Coker is contrite, apologetic and promises that when S.O. returns to Ohio if she did not want sex, the couple would not have sex. Coker stressed that he would never hurt S.O. again and that when they have sex S.O. will want to have it willingly and lovingly.

{¶ 15} S.O. testified that she divorced Coker and moved permanently to Texas.

{¶ 16} During cross-examination, the defense questioned S.O. regarding the dates specified in the indictment:

Q: I'll repeat. Count One of the indictment January 1st, 2020, to June 14, 2020, is when Stephen is alleged to have raped you?

A: Yes.

Q: What date in there do you know of that he raped you; can you give a specific date?

7.

A: Sorry. I didn't write down exact times.

Q: Can you give me a specific day, yes or no?

A: No.

Q: Okay. Count Three, April of 2019 to September 1st of 2019 can you give us a specific date when he raped you?

A: No.

Q: Okay. Thank you. Now, in Count Two, the date is January 30th, 2020 [2019], correct?

A: Yes.

Q: And you testified that he raped you on that day?

A: Yes.

Q: Did you give any details? You didn't give any details on direct examination of the details of that, did you?

\* \* \*

Q: Okay. What were those details?

A: That's whenever I consensually had sex. And then the second time I told him no and I was crying.

{¶ 17} Family-friend, T.W., testified that he was aware that S.O. and Coker were having marital issues. Eventually Coker told T.W. about S.O. "misconstruing" that he was taking advantage of her and raping her. T.W. stated that he did not share Coker's

8.

belief that the marriage bed is undefiled and that a wife was not permitted to refuse her husband's sexual advances. Coker complained to T.W. that he and S.O. were not sexually intimate enough. Coker also confided that S.O. had been drinking and smoking marijuana to the point of blacking out; T.W. advised Coker that his role was to protect S.O. and not let her get into the situation.

{¶ 18} T.W. stated his belief that during some of their conversations, Coker sought information about what S.O. was telling his wife. T.W. stated that he had no concerns about Coker being around his wife.

{¶ 19} Coker called one witness to testify. Neighbor E.H. testified that she became friendly with Coker and S.O. because their daughters were in school together. E.H., her husband, Coker, and S.O. would have couples' game nights which included alcohol. E.H. stated that S.O.'s drinking would escalate as the night proceeded. Coker did not force her to drink.

{¶ 20} E.H. testified that she occasionally drove S.O.'s daughter to school to make sure she got there on time. In part, this was due to her belief that S.O. was drinking alcohol early in the day. E.H. and her husband spoke to both Coker and S.O. regarding their concerns. E.H. noted that S.O. had lost an extreme amount of weight in a short time and that she was irritable. E.H. testified that S.O. complained multiple times that there was not enough sex in her marriage.

9.

{¶ 21} A general Crim.R. 29 motion was properly raised at the close of the state's case and the conclusion of all the evidence; the motions were denied.  Following jury deliberations, Coker was found guilty on all counts.

## II. Assignments of Error

{¶ 22} Coker timely appealed his judgment of conviction and raises three assignments of error on appeal:

First Assignment of Error: Stephen Coker's convictions for Rape are not supported by sufficient evidence in violation of his right to due process of law guaranteed by Article I, Section 10 of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution.

Second Assignment of Error: Stephen Coker was denied the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

Third Assignment of Error: Stephen Coker was denied his constitutional rights to due process and a fair trial when the State engaged in prosecutorial misconduct.

## III. Law and Analysis

### A. Sufficiency of Coker's Rape Convictions

{¶ 23} In his first assignment of error, Coker contends that his Crim.R. 29 motion for acquittal should have granted because his rape convictions were not supported by sufficient evidence.  Based on the Supreme Court of Ohio's decision in *State v.*

*Ferguson*, 5 Ohio St.3d 160, 450 N.E.2d 265, 272 (1983), Coker contends that S.O.'s use of the terms "sexual encounters," "sexual activity," "being intimate," having "sex," or "back to the old cycle" when discussing the alleged rapes during the time frames attached to the counts in the indictment was insufficient to prove penetration of her vaginal or anal opening or fellatio or cunnilingus.

{¶ 24} Reviewing a denial of a motion for acquittal under Crim.R. 29, an appellate court applies the same test as a sufficiency-of-the-evidence claim. *State v. Bates*, 6th Dist. Williams No. WM-12-002, 2013-Ohio-1270, ¶ 49, citing *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 40. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Bailey*, 6th Dist. Huron No. H-22-008, 2023-Ohio-657, ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. Accordingly, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 16, quoting *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13. "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *Richardson* at ¶ 13.

11.

**{¶ 25}** Rape, R.C. 2907.02(A)(2), prohibits a person from engaging in sexual conduct with another "when the offender purposely compels the other person to submit by force or threat of force." "Sexual conduct" is statutorily defined as

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

**{¶ 26}** Thus, in order to sustain a rape conviction predicated on sexual conduct, the state must prove beyond a reasonable doubt that the defendant and victim engaged in vaginal or anal intercourse or fellatio or cunnilingus. *State v. Ferguson*, 5 Ohio St.3d at 167, 450 N.E.2d 265 (1983), citing R.C. 2907.01(A). The slightest degree of penetration will establish vaginal or anal intercourse. *Id.*

**{¶ 27}** In addition, the exact date and time is generally not an essential element to the crime of rape. *State v. Dubose*, 6th Dist. Lucas No. L-15-1194, 2016-Ohio-7883, ¶ 18-19, citing *State v. Sellards*, 17 Ohio St.3d 169, 171, 478 N.E.2d 781 (1985). However, where the indictment contains specific dates or time frames, the elements must correspond to each rape count. *See State v. Crosky*, 10th Dist. Franklin No. 06AP-655,

12.

2008-Ohio-145, ¶ 58-62. This prevents a conviction on charges other than those indicted by grand jury. *State v. Ketchum*, 8th Dist. Cuyahoga No. 109490, 2021-Ohio-1583, ¶ 21-32, citing *State v. Vitale*, 96 Ohio App.3d 695, 645 N.E.2d 1277 (8th Dist.1994); *State v. Powlette*, 2020-Ohio-5212, 162 N.E.3d 172, ¶ 16-19 (2d Dist.); *Shafer v. Wilson*, 364 Fed.Appx. 940, 946-47 (6th Cir.2010).

{¶ 28} In *Ferguson*, *supra*, the defendant was indicted on six counts of oral and vaginal rape. During trial, the victim testified: "He made me perform oral sex a couple times, three times. And he did it to me. And then we had intercourse a couple times. Just kept going back and forth." *Id.* at 161.

{¶ 29} Holding that the evidence was insufficient to sustain guilty verdicts as to the vaginal rape counts, the court explained:

> [T]he state's evidence on the element of sexual conduct was insufficient to establish that appellee had either vaginal or anal intercourse with the victim. The victim's testimony was that she and appellee only had "intercourse." The victim did not testify that she and appellee had sexual intercourse, nor did the victim testify as to any degree of penetration. Inasmuch as one of the accepted definitions of the term "intercourse" relates to sexual intercourse, we could infer from the victim's testimony that she and appellee engaged in sexual intercourse. Two considerations prevent us from drawing that inference. First, in recognition of the state's

13.

burden of proof in criminal cases, we will not draw inferences against the accused from what must be characterized as vague and ambiguous testimony. Second, the record is completely devoid of any other evidence from any source that appellee and the victim engaged in "sexual intercourse" on the evening in question.

Consequently, in a rape prosecution where the state's evidence is essentially the testimony of the victim, and where the victim testifies that she and the accused only had "intercourse" and does not testify as to any degree of vaginal or anal penetration, convictions on charges relating to either vaginal or anal intercourse are based on insufficient evidence. That being the case, judgments of acquittal must be entered as to the two charges of rape which were based on vaginal or anal intercourse.

*Id.* at 167-68.

{¶ 30} Relying on *Ferguson*, the court in *In re J.S.*, 8th Dist. Cuyahoga No. 102800, 2015-Ohio-4990, ¶ 21, determined that the minor victim's testimony that she and the defendant had sex, including that she was naked and that the defendant had his underwear off and he was laying on top of her, and that when they finished having sex she took a shower, was insufficient to prove penetration. The court noted:

Being mindful of the serious nature of the charge, its lifetime implications, and the state's burden of proof beyond a reasonable doubt,

this court "will not draw inferences against the accused from what must be characterized as vague and ambiguous testimony." [*Ferguson* at 168.] While we recognize the sensitive nature of the testimony and we respect the instinct of an adult to protect the children, our criminal justice system, as a matter of law, mandates that the state prove the essential elements of its case with sufficient detail, beyond a reasonable doubt. In this case, the state failed to elicit the details necessary in order to demonstrate or otherwise prove penetration, however slight, sufficient to satisfy the element of "sexual conduct."

*Id.* at ¶ 21.

{¶ 31} Here, S.O.'s testimony regarding vaginal, oral, and anal penetration does not correspond with the dates charged in the indictment. That is, she testified, generally, that "[a] lot of times" she would "wake up to him***inserting himself inside [her]," which she confirmed meant "putting his penis in [her] vagina," and there were also "times" when she would wake up to him "performing oral sex on [her]." Although S.O. did not give a specific timeframe for this conduct, the state clarified during a later portion of her testimony that this conduct began in 2016, when they moved into their Rossford home, and extended "all the way through January 2019."

{¶ 32} In addition, later in her testimony, S.O. confirmed that in addition to "vaginal sex" and "oral sex," another "sex act[] that occurred during those episodes" was

anal sex—which she testified meant "his male part going into my anus"—but there was no specific timeframe given for these "episodes."

{¶ 33} Accordingly, although S.O. did testify regarding "sexual conduct" as defined by R.C. 2907.01(A) and as required by the Ohio Supreme Court in *Ferguson*, this testimony does not relate to the specific indictment periods. Because the indictment contains specific dates and time frames, the elements must correspond to each rape count, *Crosky*, ¶ 58-62. Coker cannot be convicted for any charges other than those indicted by the grand jury. *Ketchum* at ¶ 21-32; *Powlette*, ¶ 16-19. We must, therefore, review S.O.'s testimony regarding the three specific indictment periods.

{¶ 34} As to Count 1, encompassing the dates of January 1 to June 14, 2020, S.O. agreed that during that time frame she and Coker were back to their "repeated cycle of sexual encounters" and that on May 7, 2020, she and Coker were engaged in "sexual activity" when it became a bit rough, she asked him to stop because it hurt her back, he held her down, and she suffered a rug burn from the carpet.

{¶ 35} As to Count 2, alleged to have occurred on January 30, 2019, S.O. stated that "after an event of having being intimate with Stephen* * * I said no, and we had sex again and I laid there crying***."

{¶ 36} Finally, Count 3, the dates of April 1 to September 1, 2019, S.O. stated that she and Coker were back to their "old cycle of several times a week and several times a night when [she] didn't want to."

16.

{¶ 37} Coker's argument is that the state failed to provide sufficient evidence as to the sexual conduct element in relation to the specific times frames in the indictment is countered by the state's assertion that during trial S.O. and the state "adopted the terms sexual encounter to describe the sexual intercourse that occurred, as Appellant acknowledges [in his brief.] and that looking at her testimony as a whole it supports Coker's rape convictions." Coker disputes this assertion.

{¶ 38} Reviewing the record, there is no evidence to support that the state established that any of the terms used during S.O.'s testimony or throughout the course of the trial, which included "sexual activity," "sexual encounters," "being intimate," and "having sex," would denote that Coker and S.O. engaged in "sexual conduct" as defined under R.C. 2907.01(A). *Ferguson* precludes this court from inferring that the terms used by the state fall within the definition of "sexual conduct" under the statute. Similarly, although S.O. confirmed during cross examination that Coker "raped" her during each of the 3 indictment periods, *Ferguson* precludes this court from inferring that means "sexual conduct" as defined by R.C. 2907.01(A).

{¶ 39} Nor can we infer from S.O.'s testimony regarding the unwanted sexual conduct during unindicted time frames, which included penetration of her vagina and anus and cunnilingus, that Coker committed the same acts during the time frames set forth in the indictment. We acknowledge that allegations of rape in a martial relationship often involves course-of-conduct rather than isolated incident testimony. Such other act

17.

testimony may be relevant to explain the course of the parties' relationship and to demonstrate Coker's motive, intent, plan or scheme. Evid.R. 404(B). *See Sate v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278. However, the fact that such evidence is admissible does not eliminate the requirement that all the elements of the charges in the indictment be proven beyond a reasonable doubt.

{¶ 40} After careful review of the evidence presented at trial, the state's evidence on the element of sexual conduct was insufficient to sustain Coker's rape convictions. Based on the foregoing, Coker's first assignment of error is well-taken.

## B. Additional Assignments of Error

{¶ 41} Because Coker's rape convictions are not supported by sufficient evidence, his second and third assignments of error regarding ineffective assistance of counsel and prosecutorial misconduct are rendered moot.

## IV. Conclusion

{¶ 42} Accordingly, the August 18, 2022 judgment of the Wood County Court of Common Pleas is reversed and Coker's convictions are hereby vacated. The state is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed,
and convictions vacated.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

18.

Christine E. Mayle, J.   _____
           JUDGE

Gene A. Zmuda, J.

          _____
Charles E. Sulek, J.      JUDGE
CONCUR.

          _____
           JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.