[Cite as *State v. Sturtevant*, 2024-Ohio-371.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

State of Ohio                                    Court of Appeals No.  WM-22-004

       Appellee                              Trial Court No.  21CR000225

v.

Christopher A. Sturtevant                **DECISION AND JUDGMENT**

       Appellant                             Decided:  February 2, 2024

* * * * *

Katherine J. Zartman, Williams County Prosecuting Attorney,
for appellee.

Karin L. Coble, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} Appellant, Christopher Sturtevant, appeals from the judgment of the Williams County Court of Common Pleas convicting him of two counts of rape. For the reasons that follow, the trial court's judgment is affirmed.

## Statement of the Case

{¶ 2} On March 15, 2022, the Williams County grand jury indicted appellant on four counts of first-degree felony rape committed against two adult female victims, who are hereinafter referred to as "A.S." and "G.P."

{¶ 3} Counts I and III alleged that appellant engaged in sexual conduct with the victims when their ability to resist or consent were substantially impaired because of a mental or physical condition of which appellant knew or had reasonable cause to believe existed, in violation of R.C. 2907.02(A)(1)(c). Counts II and IV alleged that appellant purposely compelled the victims to submit to sexual conduct by force or threat of force, in violation of R.C. 2907.02(A)(2).

{¶ 4} The matter went to jury trial on August 15, 2022. The jury found appellant guilty as charged under counts I and III, but found him not guilty under counts II and IV. Appellant was sentenced to serve an indefinite prison term of seven to ten and a half years on each charge, and the sentences were ordered to be served consecutively.

## Statement of the Facts

{¶ 5} This case involves a small group of friends and relatives. Their relationship to one another is as follows. Appellant is the cousin of A.S. and A.S.'s brother, Austin. A.S. and G.P. are best friends, and in the months just prior to the offense, appellant had been a casual sexual partner of G.P.'s. During the period in question, all four individuals regularly spent time together.

2.

**{¶ 6}** On the night of December 4, 2021, A.S., G.P., Austin, and appellant were together in appellant's trailer, where appellant resided with his stepfather, Michael Green. A.S. and G.P. arrived at around 10:30 p.m. They consumed alcohol, smoked marijuana, and played pool. At around 11:00 – 12:00 p.m., Austin left the gathering and went home to a neighboring trailer.

### A.S. Testimony

**{¶ 7}** At trial, A.S. testified that after smoking what she believed to be marijuana provided by Michael Green, she began feeling nauseated and very lethargic, like she could hardly move. G.P. indicated to A.S. that she, too, was very tired, dizzy, and needed to lie down. A.S. said that she walked to the bathroom, where she tried to calm herself down, and then she and G.P. walked to appellant's bedroom. Fully dressed, they laid down on his bed. According to A.S., G.P. was anxious and having trouble breathing, but then later fell asleep. Thereafter, appellant came into the room and got into bed with A.S. and G.P. At that point, A.S. was still feeling tired, nauseated, and dizzy.

**{¶ 8}** A.S. stated that she eventually fell asleep, but then awoke to find appellant forcibly raping her, with his penis in her vagina. A.S. told appellant to stop as she hit him and tried pushing him away. Appellant strangled A.S., causing her to lose consciousness multiple times. The rape ended during one of the periods when A.S. was blacked out. When she awoke, she found appellant lying on the bed next to her, pretending to sleep. A.S. grabbed her clothes and scrambled into the bathroom, where she cleaned up blood that was dripping down her legs. She put her clothes on and ran back into the bedroom to

3.

wake G.P. According to A.S., G.P. was no longer wearing her pants and underwear. The two women began hitting appellant in order to wake him up. Upon awakening, appellant looked at A.S. and said, "[Y]ou're not Grace," and "[U]h oh, I'm in trouble."

{¶ 9} A.S. and G.P. then ran out of the trailer and went to A.S.'s car. A.S. called Austin, who was inside of their father's residence. Austin brought the girls into his father's home, and he convinced A.S. and G.P. to go to the hospital.

{¶ 10} A.S. underwent a sexual assault examination at a hospital in Angola, Indiana. The injuries she sustained during the attack included a ripped and scratched vagina, and bruises to her abdominal floor, legs, hips, and neck.

### G.P. Testimony

{¶ 11} G.P. confirmed that she and A.S. ingested marijuana and alcohol on the night in question. She also testified to the same people being present at appellant's residence. She stated that she and A.S. "were very, very woozy," so they went to the bathroom to talk awhile, and then they decided to "pass out" on appellant's bed. G.P. fell asleep, and awoke to find that neither she nor A.S. had any clothes on. G.P. felt "vaginal pain" and pain around her neck. She was bleeding "down there" and "it was hurting really bad." In addition, she noticed bruises on her neck. She saw A.S. heading to the bathroom and right away knew "something was wrong." She said that appellant was acting "very weird," and was saying, "[O]h, I'm seeing doubles of everything. Oh wait, you guys aren't the same person?" G.P. stated that she and A.S. went to A.S.'s car, and then Austin let them into his house.

4.

{¶ 12} G.P. stated that based upon what she felt, she believed that she was raped and strangled. She stated that she was surprised because "usually she would have consented to [appellant]." On this night, however, she did not consent to sex with appellant.

### Austin Testimony

{¶ 13} A.S.'s brother, Austin, confirmed that the group of friends were together at appellant's residence, drinking and smoking marijuana. After he left, Austin was lying down at home when A.S. and G.P. began "blowing up" his phone, trying to get his attention and asking for help. Austin said that when he found the two women, they were "half naked" and shaking, scared, and crying. Overhearing A.S. talking on the phone with her friend Hailey, Austin got the impression that A.S. was hurt. Once Hailey arrived at his home, A.S. and G.P. told Austin "what went on."

### Cathy Dirrim Testimony

{¶ 14} Hailey drove A.S. and G.P. to the hospital. Hours after the attack, Sexual Assault Nurse Examiner ("SANE nurse") Cathy Dirrim conducted a rape kit examination examination of A.S. Dirrim testified that she found vaginal tears in A.S.'s genitals, and that she collected white fluid from A.S.'s vaginal canal. G.P. elected not to have a rape kit examination.

### Detective Ben Baldwin Testimony

{¶ 15} Detective Ben Baldwin of the Williams County Sheriff's Office handled the investigation of the sexual assault. He responded to the hospital when A.S. reported

5.

the rape. Following a brief interview of A.S., Baldwin collected bedding from appellant's residence, took photos of the residence, and then asked appellant to come to the police station for a voluntary interview. While at the station, Baldwin, with appellant's consent, swabbed appellant's penis for DNA.

## Forensic Scientist David Miller Testimony

{¶ 16} David Miller is a forensic scientist employed by Ohio's BCI's DNA unit. He testified that vaginal/cervical swabs and internal genital swabs that were collected from A.S.'s body during her sexual assault exam contained a mixture of DNA from A.S. and appellant. The DNA from appellant that was found in A.S.'s vagina/cervix was from his sperm. Miller also testified that the penile swab that was taken from appellant by Det. Baldwin contained a mixture of DNA from appellant and G.P.

## Appellant's Second Police Interview

{¶ 17} After receiving the DNA results from BCI, Det. Baldwin asked to interview appellant a second time. Prior to the interview, Baldwin read appellant the *Miranda* warnings, and appellant indicated that he understood. In the interview, after being confronted with the DNA results, appellant eventually admitted to raping both A.S. and G.P. Among other things, appellant stated, "I still can't grasp the fact that I fucked [A.S.]. Why didn't she scream?" He stated that he and A.S. had consensual sex that night, and that A.S. "wasn't moaning or anything, * * * [s]he just laid there." He further stated, "[W]hy didn't they stop me?" and "[W]hy didn't they scream?"

6.

**{¶ 18}** When Baldwin asked what appellant thought to himself when he was inside of A.S., appellant answered, "[W]hat the fuck did I do, what the hell did I just do?" He said he remembered being inside A.S. and he "swore it was [G.P.] but no." Appellant admitted that A.S. "was not okay with it." Appellant stated that he pretended to be asleep because he "didn't want to realize" what he had done, because "it's not me." And he admitted that A.S. was "passed out."

**{¶ 19}** Appellant stated that he had to have been hallucinating and that he wished he could take back the things that happened. He further stated that he "wanted to believe that [G.P.] was awake but she wasn't," and that A.S. did not wake up until he was inside of her. Appellant stated that he never would have thought he was capable of something like that and that he never would have done it sober.

**Cell Phone Screenshot**

**{¶ 20}** State's Exhibit 10 is a photo of a screenshot from a cell phone. A.S. and G.P. testified that appellant posted the message on his Snapchat story on the morning after the rapes. The message reads:

> I'm sorry I dunno what's fully going on or what I did, I took some shit shortly after I got home yesterday idk what it is or how long it lasts I am sorry words don't explain I just don't understand what's goin on my head is spinning I'm tired but Can't sleep I'm hungry but can't eat its like an acid trip gone wrong …idk if it was laced I just I dunno [sad emoji] I'm sorry this isn't me or who I am

7.

State's Exhibit 10 (errors sic). Appellant acknowledged in his testimony that he wrote that message and that it appeared on his Snapchat story, but he denied that the message was written the day after the rapes.

## Appellant's Testimony

{¶ 21} At trial, appellant confirmed that on the night in question, A.S., G.P., and Austin came over to his residence, and that A.S. and G.P. appeared high and impaired after smoking marijuana in his cousin's car. He further confirmed that following their arrival, A.S. and G.P. smoked more marijuana and drank alcohol. Appellant testified that some of what A.S. and G.P. ingested was dab, or high-concentrated THC. Appellant acknowledged that A.S. and G.P. went into his bedroom together, and that he later joined them on the bed. He denied engaging in any sexual activity with A.S. that night, but he stated that he had "consensual sex" -- specifically "intercourse" -- with G.P. He recounted his version of the sexual encounter with G.P. as follows:

> [She] stuck her hand down my boxers and started to play around with me. And from there it led to me playing with her and took off our bottom clothes and then that's when we proceeded to have sex. * * * It was about ten to fifteen minutes. * * * And then I proceeded to get off of her and I put my boxers and my shorts back on and she put her clothes back on and laid right back down."

{¶ 22} On cross-examination, appellant admitted that he engaged in "sexual conduct" with G.P. and he agreed with the prosecutor that "vaginal penetration would be sexual conduct." Appellant indicated that he fell asleep, and then awoke to A.S. going to the bathroom. He stated that A.S. and G.P. left the residence shortly thereafter.

8.

**Assignments of Error**

{¶ 23} Appellant asserts the following assignments of error on appeal:

I. The conviction as to G.P. is unsupported by legally

sufficient evidence.

II. The convictions were against the manifest weight of the

evidence.

**Analysis**

**Sufficiency of the Evidence**

{¶ 24} Appellant argues in his first assignment of error that there was insufficient evidence to support his conviction for the rape of G.P. In determining whether there is evidence sufficient to support a conviction, "'[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. Thus, an appellate court will not weigh the evidence or assess the credibility of the witnesses. *See State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 16. "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13.

{¶ 25} R.C. 2907.01(A)(1)(c), the provision under which appellant was convicted, states:

> No person shall engage in sexual conduct with another who is
> not the spouse of the offender * * * when any of the
> following applies:
>
> * * *
>
> The other person's ability to resist or consent is substantially
> impaired because of a mental or physical condition or because
> of advanced age, and the offender knows or has reasonable
> cause to believe that the other person's ability to resist or
> consent is substantially impaired because of a mental or
> physical condition or because of advanced age.

"Sexual conduct" is defined at R.C. 2907.01(A) as "vaginal intercourse between a male and female * * *." Under the statute, "[p]enetration, however slight, is sufficient to complete vaginal * * * intercourse." *Id.*

{¶ 26} Citing *State v. Ferguson*, 5 Ohio St.3d 160, 167, 450 N.E.2d 265 (1983), appellant argues that there was insufficient evidence of sexual conduct in this case. In *Ferguson,* the Ohio Supreme Court concluded that the evidence was insufficient to sustain guilty verdicts as to rape counts that were based on vaginal or anal intercourse, explaining as follows:

10.

[T]he state's evidence on the element of sexual conduct was insufficient to establish that appellee had either vaginal or anal intercourse with the victim. The victim's testimony was that she and appellee only had "intercourse." The victim did not testify that she and appellee had sexual intercourse, nor did the victim testify as to any degree of penetration. Inasmuch as one of the accepted definitions of the term "intercourse" relates to sexual intercourse, we could infer from the victim's testimony that she an appellee engaged in sexual intercourse. Two considerations prevent us from drawing that inference. First, in recognition of the state's burden of proof in criminal cases, we will not draw inferences against the accused from what must be characterized as vague and ambiguous testimony. Second, the record is completely devoid of any other evidence from any source that appellee and the victim engaged in "sexual intercourse" on the evening in question.

Consequently, in a rape prosecution where the state's evidence is essentially the testimony of the victim, and where the victim testifies that she and the accused only had "intercourse" and does not testify as to any degree of vaginal

or anal penetration, convictions on charges relating to either vaginal or anal intercourse are based on insufficient evidence. That being the case, judgments of acquittal must be entered as to the two charges of rape which were based on vaginal or anal intercourse.

*Id.* at 167-168, 450 N.E.2d 265; *see also State v. Coker*, 2023-Ohio-4339, --- N.E.3d --- (6th Dist.) (testimony by victim concerning "sexual activity," "sexual encounters," "being intimate," and "having sex" with the defendant was insufficient to establish that she and the defendant engaged in "sexual conduct" as defined under R.C. 2907.01(A)).

{¶ 27} We find this case to be factually distinguishable from both *Ferguson* and *Coker.* In the instant case, appellant himself unambiguously testified at length on direct examination that both on the night in question and on earlier occasions he had "intercourse" and "sex" with G.P. His point in offering this testimony was not that there was no sexual conduct between himself and G.P., but rather that the sexual conduct that took place between them was on every occasion -- including on the night in question – was consensual.

{¶ 28} Appellant doubled-down on this position during cross-examination -- this time even more specifically -- when he admitted that on the night in question, he engaged in "sexual conduct" with G.P. In response to his appellate counsel's concern that "this is a legal conclusion with a specific legal definition that appellant could not be expected to know," we note that appellant demonstrated understanding of the term "sexual conduct"

12.

when, immediately after this admission, he agreed with the prosecutor that "vaginal penetration would be sexual conduct."

{¶ 29} Appellant's own trial testimony, wherein he clearly and unequivocally admitted to having sex with G.P. on the night of the gathering, together with G.P.'s testimony that when she woke up she was "bleeding down there, and it was hurting really bad;" that she had "vaginal pain;" and that she believed she had been raped based upon what she felt physically, was more than sufficient to establish the element of sexual conduct in this case. Accordingly, appellant's first assignment of error is found not well-taken.

**Manifest Weight of the Evidence**

{¶ 30} Appellant argues in his second assignment of error that the two rape convictions were against the manifest weight of the evidence. When determining whether a conviction is against the manifest weight of the evidence, an appellate court must "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving any conflicts in the evidence, the jury clearly lost its way and thereby created such a manifest miscarriage of justice that the conviction must be reversed and a new trial must be ordered." *State v. Rance*, 6th Dist. No. L-21-1234, 2022-Ohio-4125, ¶ 19; *see also State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

13.

{¶ 31} This court has stated that "[i]t is in appropriate for a reviewing court to interfere with factual findings of the trier of fact unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible." *Rance* at ¶ 20, citing *State v. Dean*, 2018-Ohio-1740, 112 N.E.3d 32, ¶ 25-27 (6th Dist.). "In conducting our analysis, we are mindful that the weight of the evidence and the credibility of the witnesses are matters primarily for the factfinder to determine. The rationale behind this principle is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimonies are credible." *Id.*, citing *State v. Hernandez*, 2018-Ohio-738, 107 N.E.3d 182, ¶ 28 (8th Dist.). "A defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness' testimony are inconsistent or contradictory." *Id.,* citing *State v. Sykes*, 6th Dist. Lucas No. L-21-1181, 2022-Ohio-865, ¶ 25. (Additional citation omitted.) A conviction should be reversed "only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387.

{¶ 32} In support of his claim that his convictions were against the manifest weight of the evidence, appellant states that A.S. told "six different versions of events during the investigation." Our review of the record reveals only minor inconsistencies in the details that A.S. provided about the rape. Primarily, the inconsistencies centered around the precise points at which events transpired as A.S. alternately lost and regained

consciousness during appellant's attack. As to all major details about the rape, A.S.'s testimony was clear and consistent.

{¶ 33} Appellant also claims that A.S.'s brother's testimony was "entirely at odds" with testimony by A.S. and G.P., inasmuch as the women testified that they were fully clothed when, following the attack, they exited appellant's home, yet Austin remembered that they were "half-naked." Again, we consider this a minor inconsistency, unrelated to the larger question of whether or not the rapes occurred.

{¶ 34} Finally, appellant claims that the DNA evidence "tends to support appellant's version of events," inasmuch as "[w]e don't have G.P.'s DNA in A.S." and "we don't have A.S.'s DNA on [appellant's] penis." We disagree.

{¶ 35} At trial, A.S. and G.P. testified to their rapes directly. In answer to this testimony, appellant admitted to engaging in sexual conduct with G.P., but denied ever having sex with his cousin, A.S. DNA evidence of appellant's sperm inside A.S.'s vaginal vault both contradicted appellant's testimony and corroborated A.S.'s claim that appellant engaged in sexual conduct with her. Injuries to both victims corroborated the victims' claims that, in both cases, the sexual conduct occurred while appellant was committing the offense of rape. Upon review, we conclude that the jury did not clearly lose its way and create a manifest miscarriage of justice requiring that appellant's convictions be reversed and a new trial ordered. Accordingly, appellant's second assignment of error is found not well-taken.

15.

## Conclusion

**{¶ 36}** The judgment of the Williams County Court of Common Pleas is affirmed.

Appellant is to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.           _____

                                                       JUDGE

Christine E. Mayle, J.

                                  _____

Myron C. Duhart, J.                               JUDGE
CONCUR.

                                  _____

                                                     JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.